ACCEPTED
12-14-00323-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
11/3/2015 4:23:01 PM
Pam Estes
CLERK

## No. 12-14-00323-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
11/3/2015 4:23:01 PM
PAM ESTES
Clerk

# In the Twelfth Court of Appeals
# Tyler, Texas

## David Tubb and Superior Shooting System, Inc.,
## Appellants

## v.

## Aspect International, Inc. and James Sterling,
## Appellees

# Appellants' Reply Brief

Wesley Hill
Bar No. 24032294
Ward, Smith & Hill, PLLC
P. O. Box 1231
Longview, Texas 75606
Telephone: 903-757-6400
Facsimile: 903-757-2323

Greg Smith
Bar No. 18600600
Ramey & Flock, P. C.
100 E. Ferguson, Suite 500
Tyler, Texas 75702
Telephone: 903-597-3301
Facsimile: 903-507-2413

Attorneys for Appellants

*Oral Argument Requested*

# CONTENTS

Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

The Reply Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  The "gotcha" of an incomplete record has been cured . . . . . . . . . . . . . . . 1

II.  Aspect has not proved a repudiation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.  Aspect is wrong about the substantive law:
       Repudiation requires the absolute, unconditional
       refusal to perform in the future . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   B.  Aspect likewise is wrong about the standard and scope of review . . 5

       1.  In determining whether undisputed historical facts
           constitute a repudiation, this Court makes a legal
           determination, which it decides de novo . . . . . . . . . . . . . . . . . . . 5

       2.  Under *City of Keller v. Wilson*, the emails and phone-call
           transcripts must be considered in context and in their
           entirety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   C.  The facts not only do not establish a renunciation, they negate
       it . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   D.  Superior did not repudiate the deal by once forwarding a
       lawyer's suggestion about a lease arrangement . . . . . . . . . . . . . . . . 19

   E.  Aspect's claims about the supply of materials do not even
       prove an ordinary breach, let alone establish a repudiation . . . . . . . 21

III.  There is no probative evidence of damages: Sterling's attempt to
      value his services was both inadmissible and legally insufficient . . . . . . 23

Conclusion and Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Appendices:

    A.   PX55

    B.   Detailed Phone-Call Transcript Excerpts
         (PX55 & DX17, 18a, 19a, 20a, & 21a)

# AUTHORITIES

**CASES:**

*Cal-Tex Lumber Company v. Owens Handle Company*,
     989 S.W.2d 802 (Tex. App.–Tyler 1999, no pet.) . . . . . . . . . . . . .  19, 20

*City of Keller v. Wilson*,
     168 S.W.3d 802 (Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7, 19, 27

*Coastal Transportation Co. v. Crown Cent. Petroleum Corp.*,
     136 S.W.3d 227 (Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Crown Life Ins. Co. v. Reliable Mach. & Supply Co.*,
     427 S.W.2d 145 (Tex. Civ. App.–Austin 1968, writ ref'd n.r.e.)  . . . .  20

*Dallas Railway & Terminal Co. v. Gossett*,
     294 S.W.2d 377 (Tex. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Dudley v. Born*,
     710 S.W.2d 638 (Tex. Civ. App.–Beaumont 1986, writ ref'd n.r.e.)  . .  2

*Ennis Business Forms, Inc. v. Gehrig*,
     534 S.W.2d 183 (Tex. Civ. App.–Waco 1976, writ ref'd n.r.e.)  . . . .  2, 3

*Griffith v. Porter*,
     817 S.W.2d 131 (Tex. App.–Tyler 1991, no writ) . . . . . . . . . . . . . . .  21

*Holt Atherton Indus., Inc. v. Heine*,
     835 S.W.2d 80 (Tex. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Houston Unlimited, Inc. Metal Processing  v. Mel Acres Ranch*,
     443 S.W.3d 820 (Tex. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 27, 28

*In re R.J.H.*,
     79 S.W.3d 1 (Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Jenkins v. Jenkins*,
991 S.W.2d 440 (Tex. App.–Fort Worth 1999, pet. denied) . . . . . . 2, 4

*Kerr-McGee Corp. v. Helton*,
133 S.W.3d 245 (Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28

*Kilgore v. Northwest Texas Baptist Educ. Soc.*,
37 S.W.598 (Tex. 1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Mar-Len of Louisiana v. Gorman-Rupp Company*,
795 S.W.2d 880 (Tex. App.–Beaumont 1990, writ denied) . . . . . . . 4, 5

*Mayhew v. Town of Sunnyvale*,
964 S.W.2d 922 (Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Murray v. Crest Construction*,
900 S.W.2d 342 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Natural Gas Pipeline Co. of Am. v. Justiss*,
397 S.W.3d 150 (Tex. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*New York Party Shuttle, LLC v. Bilello*,
414 S.W.3d 206 (Tex. App.–Houston [1st Dist.] 2013, pet. denied) . . 2

*Porras v. Craig*,
675 S.W.2d 503 (Tex. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*State Farm Fire and Cas. Ins. Co. v. Vandiver*,
941 S.W.2d 343 (Tex. App.–Waco 1997, no pet.)(per curiam) . . . . . . 1

*Stinson v. Cravens, Dargan & Co.*,
579 S.W.2d 298 (Tex. Civ. App.-Dallas 1979, no writ) . . . . . . . . . . 24

*Taylor Publishing Co. v. Systems Marketing, Inc.*,
686 S.W.2d 213 (Tex. App.–Dallas 1984, writ ref'd n.r.e.) . . . . . . . . 20

*Volkswagen of Am., Inc. v. Ramirez*,
159 S.W.3d 897 (Tex.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**RULES, STATUTES AND OTHER AUTHORITIES:**

17A Am. Jur.2d Contracts § 723 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17 C.J.S. Contracts § 712 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

49 David R. Dow & Craig Smyser, Texas Practice:
      Contract Law § 9.11 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Restatement (Second) of Contracts § 250 . . . . . . . . . . . . . . . . . . . . . . . 20

13 Williston on Contracts § 39:40 (4th ed.) . . . . . . . . . . . . . . . . . . . . . 2, 4

23 Williston on Contracts § 63:45 (4th ed.) . . . . . . . . . . . . . . . . . . . . . . . 4

## The Reply Argument

### I. The "gotcha" of an incomplete record has been cured.

Initially, the reporter's record omitted transcriptions of several short video-deposition clips that were presented to impeach James Sterling during cross-examination. Aspect says this means it wins. Not at all. Because the court reporter has filed a supplemental record including her transcription of each deposition clip played at trial, the record is complete. *See* Supp. RR vols 5a and 6a.[1]

### II. Aspect has not proved a repudiation.

Aspect's recovery–a rescissionary award purporting to value Sterling's invested time–is not sustainable absent proof that Superior repudiated the ammunition deal. There is no such proof. Rather, the facts–largely drawn from uncontested emails and phone-call transcripts–not only do not support a repudiation claim, they negate it.

---

[1]Besides, the Sterling deposition was preserved by videotape *and* a written deposition transcript made when the deposition was given. The original trial record identifies each impeachment video clip by terminal page-and-line references to that written transcript. *E.g.*, 5 RR 5 ("I want to look, specifically, at Page 69, lines 5 through 16."). In this circumstance, the record could alternatively be supplemented by directing the court reporter to file the relevant portions of the written deposition transcript. *State Farm Fire and Cas. Ins. Co. v. Vandiver*, 941 S.W.2d 343, 348-49 (Tex. App.–Waco 1997, no pet.)(per curiam). If for any reason the Court were to deem the current supplemental record inadequate (it isn't), Superior would in that event request the opportunity to supplement the record with the deposition transcript excerpts.

### A. Aspect is wrong about the substantive law: Repudiation requires a defendant's absolute, unconditional refusal to perform in the future.

Aspect argues "repudiation lite," whereby it bootstraps allegations of a past ordinary breach into an inference or "indication" of a future ordinary breach and then calls the result a repudiation.

For over 100 years, the Texas courts have insisted that repudiation occurs only when the defendant's words or actions amount to the "absolute," "unconditional," and "unequivocal" present refusal to perform his contract in the future. *Kilgore v. Northwest Texas Baptist Educ. Soc.*, 37 S.W. 598, 600 (Tex. 1896) (intent to repudiate must be "declared in positive terms and unconditionally"); *Ennis Business Forms, Inc. v. Gehrig*, 534 S.W.2d 183, 189 (Tex. Civ. App.–Waco 1976, writ ref'd n.r.e.)("The doctrine of anticipatory breach is applicable only where there is an unequivocal renunciation of the contract by the defaulting party."). To have constituted a repudiation, the defendant's statements and actions must "be absolute, positive, unretracted, unretractable, and unconditional." *Dudley v. Born*, 710 S.W.2d 638, 644 (Tex. Civ. App.–Beaumont 1986, writ ref'd n.r.e.); *see also New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 216 (Tex. App.--Houston [1st Dist.] 2013, pet. denied); *Jenkins v. Jenkins*, 991 S.W.2d 440, 447 (Tex. App.–Fort Worth 1999, pet. denied). Repudiation does not arise merely because of an ordinary breach or the possibility of a future breach. 13 WILLISTON ON CONTRACTS §39:40 (4th ed.) ("mere

2

nonfeasance" will not support a determination of repudiation). Nor can a repudiation arise when the purportedly repudiating party continues in any way to perform. *See Kilgore*, 37 S.W. at 601(when the promisor is actively engaged in performance, no declared intent to abandon it at some future time could operate to terminate it); *Ennis Business Forms*, 534 S.W.2d at 189 ("The party not in default will be justified in treating the contract as repudiated or abandoned only where the other party ... clearly shows a fixed intention, *during nonperformance*, to repudiate ...")(emphasis added). Repudiation, to be effective, must go to the "whole contract ... and it must be distinct, unequivocal, and absolute." 17A AM. JUR.2D CONTRACTS §723 (2015).

To feign support, Aspect quotes from a practice guide. Yet the quoted text was never intended as a definition of repudiation. It was instead a comment on the (1) breadth and (2) certitude to which the record must show the defendant's contract renunciation. *See* Appellee Br. at 40, quoting 49 David R. Dow & Craig Smyser, TEXAS PRACTICE: CONTRACT LAW §9.11 (2015) ("To give rise to an anticipatory breach, a repudiation must be *clear and unequivocal* and must apply to *the entire contract*."). The cases the practice guide cites confirm the repudiation elements set out in Superior's initial brief, stating that repudiation

> consists of words or actions by a contracting party that indicate he is
> not going to perform his contract in the future. [citation omitted] It
> is conduct that shows a fixed intention to abandon, renounce, and

3

refuse to perform the contract." *Jenkins v. Jenkins*, 991 S.W.2d 440, 447 (Tex. App.–Fort Worth 1999, pet. denied).

And because repudiation represents a "harsh remedy," the requirement that the repudiating statement be clear and absolute is "a strict one,"[2] for which the courts intentionally "set the bar high."[3] A party's intent not to perform "may not be implied from doubtful and indefinite statements that performance may or may not take place." 23 WILLISTON ON CONTRACTS §63:45 (4th ed.). So equivocation will not suffice. Nor will ambiguous prior conduct from which the plaintiff speculates that the defendant might commit a future ordinary breach. It must be this way or else parties like Aspect could find a repudiation in every run-of-the-mill hiccup encountered in starting a new business.

The two cases Aspect discusses do not suggest any different conclusion. They both involved classic instances of repudiation – where a defendant stated in unequivocal terms that it would not perform its contract going forward. *Murray v. Crest Construction*, a *per curiam* decision, involved a contractor's unequivocal, pre-performance declaration that "it would not perform on the promissory note when its performance became due." 900 S.W.2d 342, 344 (Tex. 1995). *Mar-Len of Louisiana v. Gorman-Rupp Company*, likewise involved the clearest unequivocal and fixed

---

[2] *See* 17 C.J.S. CONTRACTS §712 (2015).

[3] 13 Williston on Contracts §39:40.

4

intention to abandon all future performance. Mar-Len not only stopped all work on the parties' project, but it expected all vendors to do likewise and told Gorman-Rupp so, stating that any contract work Gorman-Rupp might perform would be "at [its] own risk. 795 S.W.2d 880, 887 (Tex. App.–Beaumont 1980, writ denied). In both these cases, the bone of appellate contention was not on repudiation's *existence* but on its *effect*. In *Mar-Len*, for example, the issue was whether Mar-Len's "clearly undisputed" repudiation could excuse Gorman-Rupp from a condition precedent. *Id.*

**B.    Aspect likewise is wrong about the standard and scope of review.**

**1.    In determining whether undisputed historical facts constitute a repudiation, this Court makes a legal determination, which it decides *de novo*.**

This is no he-said-she-said case. The material facts as to what Tubb said or did are largely undisputed, memorialized in black-and-white emails and transcribed phone conversations. Such items don't call for credibility assessment or pose any choice between competing testimonial versions of disputed fact. Instead, Aspect's case will rise or fall on this Court's legal analysis of Tubb's undisputed words and acts. That is a matter to address *de novo*, because "the trial court is in no better position to decide legal issues than the appellate court." *In re R.J.H.*, 79 S.W.3d 1 (Tex. 2002). The analysis remains essentially a legal one even though the trial court

5

has purported to "find" repudiation as a fact rather than as a legal conclusion. The characterization of an issue as law or fact is likewise a matter this Court decides *de novo. See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 937 (Tex. 1998) ("The district court's findings ... purport to decide the ultimate legal issue of whether a taking has occurred. This, however, involves a question of law, and we therefore owe no deference to the trial court's 'findings' in this regard."). This Court owes the trial court's repudiation finding no deference.

> 2. **Under *City of Keller v. Wilson*, the emails and phone-call transcripts must be considered in context and in their entirety.**

Touting the no-evidence standard, Aspect says it may prove its repudiation lite by divorcing snippets of the parties' conversations from the larger context of the conversations as a whole–even when that context otherwise would negate the very inference Aspect seeks to draw. This is, of course, categorically wrong. Where, as here, the cause of action turns on proof of an "absolute and unconditional" refusal to perform, the plaintiff cannot render its email and phone-call proof absolute, unequivocal or unconditional by editing the contrary qualifications, equivocations and conditions out of the conversation. As stated in *City of Keller v. Wilson*, the no-evidence standard does not authorize an appellate court to ignore undisputed proof that the fact-finder would not have been allowed to reject. Nor may a court

6

selectively edit phone-call transcripts to draw conclusions that would be patently

unreasonable when considered in light of the conversations on their whole.

> [I]n a number of cases, the lack of supporting evidence may not appear until all the evidence is reviewed in context. For example, publications alleged to be defamatory must be viewed as a whole – including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself. A court reviewing legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict.
> …
> [Likewise,] in reviewing intentional infliction of emotional distress claims for legal sufficiency, "we consider the context and the relationship between the parties." Acts that might constitute outrageous conduct when dealing with a hearing-impaired consumer may be legally insufficient between business parties. In our no-evidence reviews of successful claims, we have invariably reviewed not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not.
> More generally, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. . . . *thus, if evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded . . . .* Either "evidence contrary to the verdict" must be defined to exclude material contextual evidence, or it must be an exception to the general rule. *City of Keller v. Wilson,* 168 S.W.3d 802, 811 (Tex. 2005)(emphasis added).

This is all the difference. Tubb never said Superior renounced the ammo deal. Nor

did he act to do so (such as by signing a third-party contract that could not be

performed without renouncing the contract with Aspect). And the emails, phone

transcripts, and other documentary evidence–when viewed in context as *City of Keller*

7

requires—does not support but negates any reasonable inference of absolute or unequivocal contract renunciation.

### C. The facts not only do not establish a renunciation, they negate it.

Did Superior, by its words and acts, clearly and unequivocally renounce future performance? Not at all.

- The deal terms had never required signing a written document, CR454 (FOF 10, stating deal terms), and there certainly was never any timetable for doing so. Thus, the parties' differing views on the form of agreement and the structure of the negotiation could not work a repudiation. Indeed, even an outright refusal to negotiate towards such a document would not have repudiated the contract in this case.

- Tubb always was willing to sign a contract document, and the unedited emails and phone transcripts show that he actively sought to move that process along. *E.g.*, PX55 12/31/12 transcript at 7, 9-11; 1/4/13 transcript at 2-3; 1/8/13 transcript at 10; 1/24/13 transcript at 3. He opposed Sterling's late-stage effort to bully a meeting in which Sterling's lawyer alone could have dictated a one-sided contract. But this is no evidence Tubb ever "resisted" signing a contract. Rather, Tubb had every right to insist on a balanced negotiation.

- Tubb did not sign any document. But neither did Sterling. In fact, by no fault of Tubb's, there simply never was any execution-ready document he could have considered signing. Sterling admittedly produced only a "template" or "sample" document, and he did so only as a mere "basis for negotiation." *E.g.*, 4 RR 119-20, 216-17; 5 RR 16-17; 6 RR 108.

- Tubb, like Sterling, actively involved his lawyers in working towards such a document. After consulting at least two attorneys, he provided Sterling with the discussion draft of a limited-liability-company agreement. And he repeatedly expressed his intent that the parties work towards mutually acceptable terms. (Even Sterling, in emails both to Tubb and Sterling's own

8

counsel, conceded that Tubb's position was one of "we're moving forward with this." 4 RR 203.)

That a document was not signed before Sterling quit the deal was in respects Sterling's own fault: he actively hindered the negotiation by repeatedly referring to the relationship as a "joint venture," *e.g.*, 4 RR 119-20, 5 RR 14-17, 6 RR 108, causing confusion, delay, and prompting Tubb's accurate retorts that a joint venture wouldn't work in Texas without exposing the venturers unnecessarily to undesired personal liability. *E.g.*, 4 RR 217. It was *Tubb* who furnished the only proposed agreement for a limited-liability company. Sterling seems ignorant of the effects his miscommunications caused.

More importantly, the emails and transcribed phone conversations, fairly read, show *both* men agreeing–repeatedly–that a writing was desirable and agreed to hammer one out. *E.g.*, PX55 12/31/12 transcript at 7-11. In the end, Tubb didn't sign a contract for the same reason Sterling didn't sign one: Aspect and its lawyer pulled the plug on the deal before the parties could settle on the contract's form and terms. The best way to know this is to read the unedited phone-call transcripts, which are gathered in PX55, in their contextual entirety. We have attached PX55 as an appendix to this brief. (We also include, as a second appendix, a reasonably detailed editing of the phone transcripts.) The gist of these transcripts is as follows:

9

**The New Year's Eve conversation.** In this phone call, Tubb not only endorsed a face-to-face discussion of contract terms as "a great plan," PX55, 12/01 transcript at p. 2, but he proposed to do so at a specific time and place–the Dallas Safari Club show. *Id.* Tubb then reiterated his full commitment to the deal. *Id.* at 3 ("you and I decided we were going to do a deal and 50 percent is 50 percent."). Both men agreed they should get the contract drafting "part of this arrangement behind us." Reinforcing his intent, Tubb turned the conversation to the "rough draft" agreement he had sent Sterling. *Id.* at 7. After the parties determined that an initial meeting between the lawyers wasn't in the cards, Tubb said the men should visit anyway, exactly because "we need to get an agreement if we're going to move forward." *Id.* at 10. Then Tubb reminded Sterling that the lawyers had said the deal would require a "different animal" from the structure contemplated under Sterling's proposed joint-venture type agreement. Sterling responded that he was "open to some other kind of agreement." *Id.* at 10-11.

Sterling then proposed to just turn the lawyers loose in the negotiation. *Id.* at 11. Tubb, holding a different viewpoint on how best to involve the lawyers, suggested that the parties first "sit down and ... put some outline to" the agreement. *Id.* Sterling then agreed with Tubb's proposal and ended the discussion by saying "we'll just keep moving forward." *Id.*

**The January 4 phone call.** This conversation began when Tubb proposed to "get together" as he was then in Dallas "for the Safari Club show." PX55 1/4/13 transcript at 2. Sterling balked. Knowing full well that Tubb was in Dallas without legal counsel, Sterling instead tried to bully a negotiation where *his* lawyer alone would control the discussion. To this end, Sterling claimed there would be "no sense" in any meeting unless it included *his* lawyer attempting to draft an agreement on the spot. *Id.* In other words, Sterling sought to game the situation. The conversation could have broken down then and there. But Tubb persevered, suggesting that his presence in Dallas presented a chance to at least "just sit down and … cover our points and see if we can move forward." *Id.* at 2-3. Sterling agreed that was "probably what we ought to do." Tubb suggested talking on Monday. Sterling agreed. *Id.* at 3-4.

**The January 7 phone call.** On Monday, January 7, the men spoke as promised. Tubb, unprompted, started by reurging his commitment to the deal. PX55 1/7/13 phone transcript at 2-3 ("I truly have not deviated ever from half the net profits … I'm still holding on that."). Tubb questioned whether Sterling remained committed to being paid out of manufacturing profits. *Id.* Sterling initially agreed he was, but quickly launched into a rant about how his time "keeps adding up" and how he "would need to start having some income to justify his time," goading Tubb to ask just how much time Sterling claimed to have invested. Sterling

called it "a high number" then demanded that his time on the website project – time he had never billed but had agreed to contribute as equity in the ammunition deal – now had to "get paid." *Id.* at 4-6. After some intervening discussions, including a discussion of the manufacturing location in which Tubb simply noted that looking perhaps "a couple years down the road, if we had other machines, it would have made more sense to have [the manufacturing] in Canadian.," *id.* at 11, the conversation ended with Sterling's direction for Tubb to "let me know whether you're going to pay [Sterling's website-project time] or not."

**The January 7 email.** Later on the 7th, Sterling sent Tubb an email (PX106) and an invoice for Sterling's time on the website project. Despite what Aspect now claims, this email didn't recount any "destructive" conduct or refusal to sign a contract. Just the opposite. The email's first paragraph reiterated that the parties had that day *reaffirmed* their agreement to the ammunition deal.

The email's next four paragraphs declared Sterling's other projects with Tubb to be "on hold" and reported the status of Sterling's work to procure ammunition packaging. *Id.* The email's penultimate paragraph pressed Tubb on Sterling's new demand to be paid for the website-project time. But it did not suggest that Tubb had refused to sign a contract, because he had not done so. This paragraph states in full: "San Diego Media – Since we don't have a signed contract on the ammunition project, you need to pay me for my time on the SDM project. I will

12

email you invoices later today." *Id.* The email's final paragraph (1) suggested that Sterling wanted to also begin billing for his time on the ammunition project (a breach of the agreement) and (2) declared that Sterling would refuse any further work on the ammunition project until the parties could manage to "formalize our agreement in a signed contract." *Id.*

**The January 8 phone call.** On Tuesday, January 8, Tubb acknowledged receiving Sterling's invoice for the website project work. PX55 1/8/13 phone transcript at 2. He also acknowledged a statement of time for the ammunition project and was astonished by the amounts alleged. *Id.* at 7 ("Holy smokes"). Sterling then said he'd insist the ammunition-project statement be paid in full unless the two men could manage to sign a written contract. Tubb reaffirmed his commitment "to do the ammo thing." But he disapproved Sterling's effort to extort a huge payment. And he said Sterling's choice of an hourly rate wasn't "a prudent figure." *Id.* at 8. At this point, Sterling tried to bait Tubb into walking away from the deal, saying: "[I]f you want to have a parting of the ways, then you can get your equipment out of here." *Id.* Tubb didn't bite, but asked Sterling what he preferred. Sterling responded that he was "willing to move forward" under "some kind of written contract" (reflecting that neither the wording nor even the specific kind of organizational structure had yet been settled upon). *Id.*

13

Both men agreed they should have hammered out a written contract at the outset. *Id.* at 8-9. Then, when Sterling downplayed his shared responsibility in the situation, ("I've said that [we need to sign a contract] over and over"), Tubb quickly pointed out that Sterling had furnished only a boilerplate joint-venture agreement–the very type agreement the lawyers recommended against using in Texas. *Id.* at 9. Sterling conceded the point ("That's fine"), and said he would fall in line with "whatever is appropriate" as respects the form of organizational structure. *Id.* Clearly, there was substantial work to be done before either party would be in position to sign a contract document.

In this same January 8 discussion, Tubb asked Sterling if he'd been able to review the LLC agreement forwarded from Tubb's lawyer. Sterling said an LLC would be fine. *Id.* at 10. Then both men agreed that the critical task was to state their deal in mutually agreeable words. *Id.* (Sterling: "but our agreement ... would have to be put in there ..." Tubb: "That's right. And that may be very hard for us to do."). Then, reflecting that the project was an ongoing one, Tubb asked about Sterling's progress on the retail boxes. *Id.*. The men then talked briefly about the "big bill" Sterling had just submitted, Tubb agreed he'd pay the website-project invoice, and Sterling now acknowledged that Tubb's lawyer, too, should be involved in the contract drafting. *Id.* at 11-12 (Sterling: "But who's going to be your attorney

14

that's handling it [Tubb's side of the contract drafting]? Is it going to be the guy in Amarillo?").

Sterling asked if Tubb's lawyer had seen the "sample joint-venture agreement" Sterling had sent. Tubb reminded him that the lawyer had pronounced it "not a good one." *Id.* at 12. And Sterling then conceded his document had never been more than "simply a boilerplate joint venture agreement." *Id.* at 12-13. Sterling agreed the next step was to "get our attorneys on [to]" finding the right kind of agreement. *Id.* at 13. Tubb closed by saying he'd be visiting with the raw-material suppliers. *Id.* And Sterling closed by saying he was "willing to move forward." *Id.* at 14.

**The January 9 phone call:** In this quick call, Tubb said he was sending a check for the website invoice. PX55, 1/9/13 phone transcript at 2. Sterling, having had his website-project invoice paid, talked about the need to go forward with the inventory-tracking project because it was the key to having accurate expense numbers for calculating profit under the ammunition agreement. *Id.* at 6. Sterling acknowledged receiving an email from Tubb's counsel. *Id.* at 7. And in closing Sterling said he would be talking to his counsel to "see if we can move this thing further still." *Id.*

**The January 24 phone call:** This phone call, on a Thursday, began with a clear indication the ammunition project was moving forward: a business-as-usual

15

discussion about the boxes necessary for selling ammunition. PX55 1/24/13 transcript at 2-3. Tubb then asked about the attorneys' work toward a contract document. *Id.* at 3 ("... [H]as there been any movement with the attorneys"). Sterling, whose task it was to get the lawyers together, said nothing had been done, blaming travel schedules ("[e]verybody has been traveling"). *Id.* But Sterling said he expected the lawyers to get together early the following week. *Id.* Tubb was awaiting any sign of progress.

Further confirming the deal's green-light status, the parties also talked about the effort to acquire materials. *Id.* at 4. Sterling did question Tubb about the fact that Tubb had not been able to get some materials, whereas Sterling had managed to obtain samples from a dealer ("one in .223 and one in .9 millimeter"). *Id.* at 4-5. Tubb agreed to check out the problem. And Sterling, being satisfied with that commitment, promised to "move forward," and to "next week ... follow up with the attorneys." *Id.* at 5.

**The conversations and emails on the whole:** Nothing about the December or January emails and phone conversations, considered in their full and proper context, begins to show any refusal to sign a written contract or other conduct to repudiate the deal. So as of January 24, there was no repudiation or refusal to sign a contract, and Tubb had no reason to think Sterling might ever contend otherwise. Instead, all indications were that the project was going forward,

16

although it definitely appeared that Sterling may not have actually gotten the attorneys together (at no fault of Tubb).

**The lawyer's February 5 letter:** The very next thing after Sterling's promise to follow up with the lawyers, Sterling, acting through counsel, called off the deal. To this end, Sterling's lawyer sent a demand letter forbidding Tubb to communicate with Sterling except through counsel and alleging that Tubb and Superior had "breached and repudiated" the agreement. DX24. The letter said Tubb had repudiated the deal by: (1) "insist[ing] upon design and other requirements ... that have unnecessarily delayed ... timely production of ammunition," (2) failing to provide "materials and components," and (3) "expressing a desire and intent to move the manufacturing equipment ... from Tyler, Texas ...." *Id.* Then, counsel demanded payment of $315,984 "within ten days." Aspect, he said, would hold Superior's loading equipment hostage unless it received "prompt payment of the foregoing sum." *Id.*

Of course, the matters in counsel's letter do not conceivably constitute a repudiation:

(1) Tubb had a right to set design standards. Indeed, his unquestioned expertise respecting precision ammunition was an important part of his contribution to the project. Aspect's suit does not contend that Tubb's exercise of this right was improper.

17

(2) Nor are the alleged failures to provide materials and "caliber conversion equipment" evidence of repudiation. One repudiates a contract by unequivocally declaring he will not perform it in the future. The items Aspect alleges at most raise a matter of ordinary breach. (This is not to say that it is not possible for conduct to work a repudiation. But it must be conduct *unequivocally renouncing all future performance*, such as, perhaps, entering a binding third-party contract inconsistent with the current agreement.).

(3) Respecting a manufacturing location, the parties had agreed only that the initial location would be in Tyler. Regardless what had been said in November at the Sterling home, the subsequent evidence demonstrated that (a) Tubb's opposition to Sterling's Tyler location had primarily been a reaction to learning that Sterling's garage was right by a railroad track, and (b) Tubb had gotten over this initial reaction and thereafter consistently affirmed his agreement that manufacturing would proceed in Tyler. Sterling accepted this. And Tubb relied on Sterling's acceptance, through his commitments of time and resources.

Tellingly, counsel's February 5 letter did not blame Tubb for the failure to get to a signed contract. In fact, it did not mention the matter. Nor did the letter dare invite Tubb to affirm the contract (something he had done in almost every phone conversation). Aspect instead unilaterally ended the deal, demanded $315,000, and

18

ransomed Superior's equipment, hoping to leverage Tubb's capitulation. The tactic didn't work then. Nor should it work now.

*Both* men had presented boilerplate documents and both had shown their willingness to negotiate. So why should Sterling's efforts be considered as performance and Tubb's parallel efforts at a contract be construed as renouncing the deal? Maybe Sterling's endorsements of a written contract were more animated. But there was no contest to see who could shout "I want a written contract" the loudest or most often.

Nor should this Court be fooled by Aspect's bluster about a so-called "destructive path." *E.g.*, Appellee Br. at 21, 29. None of that happened. Aspect's phone-conversation excerpts are ripped from their context and edit out Tubb's repeated affirmations and efforts toward a signed contract. They thus contradict the standard of no-evidence review established in *City of Keller*. Tubb's words and actions, properly viewed in context, were the antithesis of any clear and unequivocal renunciation of intent to perform in the future.

**D.**     **Superior did not repudiate the deal by once forwarding a lawyer's suggestion about a lease arrangement.**

Citing this Court's decision in *Cal-Tex Lumber Company v. Owens Handle Company*, Aspect claims Superior repudiated the ammunition deal in July 2012, by forwarding an informal email from Tubb's lawyer, in which the lawyer suggested

19

that a lease arrangement might work better for both parties' interests. PX82. Aspect is wrong.

A party does not repudiate his agreement merely by proposing alternative contract terms. To work a repudiation, the party must instead *demand* acceptance of his alternative terms *as an ultimatum*—where the party says he will not perform "except on conditions which go beyond the contract." RESTATEMENT (SECOND) OF CONTRACTS §250; *see Taylor Publishing Co. v. Systems Marketing, Inc.*, 686 S.W.2d 213, 217 (Tex. App.–Dallas 1984, writ ref'd n.r.e.). Such a demand "is a repudiation" because and only because the ultimatum incorporates a "complete refusal of performance" as respects the original agreement. RESTATEMENT (SECOND) OF CONTRACTS §250 cmt d; *See also Crown Life Ins. Co. v. Reliable Mach. & Supply Co.*, 427 S.W.2d 145, 150 (Tex. Civ. App.–Austin 1968, writ ref'd n.r.e.). Merely proposing that the parties consider a mutually advantageous contract tweak suggests no such ultimatum.

The *Cal-Tex* case that Aspect cites is a good example of an ultimatum/repudiation. 989 S.W.2d 802, 813 (Tex. App.–Tyler 1999, no pet.). There, the defendant lumber company not only proposed a new contract, but its representative declared "We're not going to pay you a dime [under the old contract]. ... [T]his is it. You can forget the old contract. It's this or nothing." *Id.* at 814. That kind of ultimatum is what is missing here.

20

Tubb's lawyer merely recommended a lease to Tubb, as a better "proposed approach." PX82 ("Consequently, I recommend that Superior simply lease the equipment ... to Aspect. ... I am sending a copy of this email to Marilyn Ault also so that she can offer input on *this proposed approach.*"). Sterling knew all too well that the lawyer's email was just a friendly proposal. His email response thus termed it a "suggestion ... having both 'Advantages' and 'Disadvantages,'" which Sterling would think about over the weekend. *Id.* Moreover, for the lawyer's July 2012 suggestion to now be treated as a repudiation, Sterling not only needs to find a non-existent ultimatum, but he also needed to, back in 2012, (1) contemporaneously declare the proposal a repudiation and (2) cease to perform. *E.g., Griffith v. Porter*, 817 S.W.2d 131, 135 (Tex. App.–Tyler 1991, no writ) ("if the repudiation is not accepted ..., the contract is kept alive"). Sterling did neither.[4]

E. **Aspect's claims about the supply of materials do not even prove an ordinary breach, let alone establish a repudiation.**

Aspect is far, far off base with its claims that Superior's effort to supply materials somehow worked a repudiation. First and foremost, Superior had not only spent a couple hundred thousand dollars on the loading machine, but had supplied

[4]Incidentally, Sterling in his July 2012 email response recognized that there would be "back and forth" involving lawyers and recognized that "other ideas" might yet be proposed, and he urged Tubb that throughout the process the two men should guard against being led too much by the lawyers, promising that Tubb could protect his interests "more than any legal agreement" simply by appealing "to [Sterling's] sense of honor" and the men's "long-running friendship." PX82.

substantial materials. Sterling in deposition testimony judicially conceded that Superior had provided everything (except bullets) needed to begin production. Supp. CR vol. 6A 12-13. Sterling also never disputed Tubb's testimony that Sterling knew 100,000 bullets were about to be shipped when he pulled the plug on the ammo deal. And, most important of all, Sterling's written inventory of items being returned to Superior (PX80) cataloged an extensive cache of materials, including bullet feeders, over 4,000 pounds of brass, 23 commercial containers of powder, nearly 100,000 rifle primers, 10,000 packaging trays, and even thousands of bullets. PX80. What is more:

• The record shows Aspect was not in position to ship any product until, in mid-January, when it finally procured the necessary boxes.

• The terms of agreement afforded no deadline for having materials at the ready.

• And back on January 7 (*before* Aspect procured the necessary product boxes), Sterling had declared an immediate hiatus to *all* performance, saying performance would cease until the parties signed a written document.

In these circumstances, there was no basis for finding any breach on Tubb's part at all. And if there was evidence of breach, it would be a mere ordinary breach, and no indication of any absolute or unequivocal renunciation.

Tubb may not have gotten everything Sterling wanted when he would have liked to have it, but Tubb did not ever refuse to provide materials, and certainly did not abandon, refuse, or renounce the contract in this respect.

**In summary,** to have proven an unequivocal renunciation, Sterling would have needed evidence of Tubb saying the equivalent of "I don't intend to go forward with the ammo deal," or equivalent, unequivocal conduct. But there is no such proof, and thus no repudiation.

## III. There is no probative evidence of damages: Sterling's attempt to value his services was both inadmissible and legally insufficient.

"[T]he naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force." *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156-57, 59 (Tex. 2012), quoting *Dallas Railway & Terminal Co. v. Gossett*, 294 S.W.2d 377, 380 (Tex. 1956); *see also Coastal Transportation Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). This rule applies to both expert and lay-witness opinions. *Justiss*, 397 S.W.3d at 156-57, 59. *All* opinions–even those of plaintiffs attempting to value their own losses–must have reliable bases. *See Justiss*, 397 S.W3d at 156-57, 159 (property owner's testimony was legally insufficient to

support damages where he failed to provide any reliable basis for his opinion on the diminution in his property's value).[5]

Even under the established "Property-Owner Rule," which says a landowner is qualified to testify to his property's value, the courts "insist that the testimony meet the 'same requirements [for reliable foundation] as any other opinion evidence.'" *Justiss*, 397 S.W.3d at 156, quoting *Porras*, 675 S.W.2d at 504. In all such cases, the opinion testimony is "the functional equivalent" of expert valuation testimony and as such cannot be based on "naked conjecture or solely speculative factors." *Justiss*, 397 S.W.3d at 158.

The failure to present damage valuation testimony having a reliable basis is generally fatal to recovery. *Justiss*, 397 S.W.3d at 158 ("Generally, when no evidence supports a judgment, we render judgment against the party with the burden of proof"), citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 912 (Tex.2004); *Id.* ("if an owner's estimate is speculative, 'the owner's testimony may be of such minimal probative force to warrant a judge's refusal even to submit an issue to the

---

[5] *See also Stinson v. Cravens, Dargan & Co.*, 579 S.W.2d 298, 299 (Tex. Civ. App.-Dallas 1979, no writ) (boat owner's testimony valuing his loss was "too conjectural" to be probative where he gave no reliable basis for his repair estimate); *accord Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984)(holding that even though property owner was qualified to testify to market value, his testimony provided no evidence of that value); *see also Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) (business owner's conclusory testimony of lost profits could not support a judgment).

24

jury.'"); *accord Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 827-38 (Tex. 2014); *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245 (Tex. 2004).

Sterling's damage opinion has no reliable basis and, thus, was nonprobative and inadmissible.

**Sterling's project rate.** Sterling purported to value his services by multiplying an hourly rate of $140 times the time allegedly worked. PX57; 4 RR 239. That would be fine – if only there was a reliable basis for accepting a $140 rate in the circumstances. But there isn't. Sterling said $140 was his "standard" project manager rate, 4 RR 238, which he claims Tubb paid him on other projects. 4 RR 238. But Sterling had never done anything like the ammunition deal before. He had never before loaded ammunition commercially and he had never before worked for a manufacturing company, let alone helped in automating a manufacturing operation.

Not surprisingly, Sterling did not demonstrate that he knew anything about the charges typically incurred in implementing similar set ups or about the reasonable billing practices in the industry for such efforts. (In fact, he didn't even identify the relevant industry.) And there was absolutely no rational basis for inferring the missing information. (Aspect says that Tubb agreed his work was worth $140 an hour. But Tubb actually said the opposite. While Aspect quotes Tubb, from the January 8 phone conversation, as saying "you're worth your 140

25

bucks an hour, 120 bucks an hour," this is a selective editing that mischaracterizes the testimony. Tubb actually said Sterling was worth that rate *for loading the commercial QuickBooks program and working on Superior's website*. But when it came to Sterling's services on the ammunition deal (a type of matter Sterling had never before tackled), Tubb categorically denied that Sterling had stated a fair rate. DX19a at 8 ("[I]n my opinion, you're worth your 140 bucks an hour, 120 bucks an hour working on these QuickBooks and working on San Diego Media and all *that* stuff, *but this joint venture thing*, I don't think … that's a prudent figure.").

**Sterling's qualifications.** Sterling did not demonstrate that he had even been qualified to undertake to automate an ammunition loading operation. He merely assumed he could get by,  apparently based on his skimpy and long stale experience working for an IT contractor undertaking networking tasks for Bank of America and Unisys, and the unrelated tasks he had performed for Tubb – helping with a website build-out and installing commercial accounting/inventory control software. 4 RR 93 ("It's just that, with my background, I felt like I knew that I could do all of this.") Indeed, Sterling otherwise had merely drawn insurance disability payments for the prior ten years. 4 RR 49, 5 RR 22, 45, 98. Yet Sterling's prior work for Tubb involved merely installing a server and accounting software, 4RR77-78, and working to finalize a "simple website," started by a commercial website provider, allowing customers to order products online. 4 RR 78-80, 83. Sterling did

26

not say how or why those tasks would qualify him for this work or qualify him to render an opinion as to its value.

**Sterling's hours.** Sterling likewise did not begin to explain what tasks he did that reasonably could have taken so many hours as he claimed to have expended on the project.

At a minimum, there is an analytical gap the size of Dallas standing between Sterling's value opinion and its slender-to-non-existent speculative bases. This is not a recipe for recovery. *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014)(Analytical gaps in opinion testimony make it not only inadmissible but no evidence). To draw any conclusion about a reasonable value of Sterling's efforts, one must speculate as to the scope and character of the services provided on this project, speculate that the prices Tubb previously paid Sterling for website work were reasonable for that work at that time, and further speculate that the reasonable value of the prior website services would be probative of the value of services performed in setting up an ammunition manufacturing operation. In short, Sterling's valuation testimony is pure *ipse dixit*. This is of course fatal to his opinion. *See City of Keller*, 168 S.W.3d at 813 ("[A]n appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis."). The Court should

27

reverse and render, as occurred in cases such as *Houston Unlimited, Inc.*, 443 S.W.3d at 827-38, and *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245 (Tex. 2004).

## Conclusion and Prayer

Because there is no evidence of repudiation, because the undisputed facts establish the opposite of repudiation, and because there was no non-speculative proof of damages, the Court should reverse the decision below and render judgment that Aspect and Sterling take nothing. Alternatively, the Court should reverse and remand for a new trial.

Respectfully submitted,

<u>/s/ Greg Smith</u>

Greg Smith
State Bar No. 18600600
RAMEY & FLOCK, P.C.
100 East Ferguson, Suite 500
Tyler, TX 75702
Telephone: (903) 597-3301
Facsimile: (903) 597-2413
gsmith@rameyflock.com

Wesley Hill
State Bar No. 24032294
WARD, SMITH & HILL, PLLC
P. O. Box 1231
Longview, TX 75606
Telephone: (903) 757-6400
Facsimile: (903) 757-2323
wh@wsfirm.com

**COUNSEL FOR APPELLANTS**

29

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the above and foregoing document was served upon counsel for Appellees in accordance with the applicable Texas Rules of Civil Procedure on this the 3rd day of November, 2015, on the following:

keith@mkdlaw.us
Keith Dollahite
M. Keith Dollahite, P.C.
5457 Donnybrook Ave.
Tyler, Texas 75703

trey@yw-lawfirm.com
Trey Yarbrough
Yarbrough Wilcox, PLLC
100 E. Ferguson, Suite 1015
Tyler, Texas 75702

   /s/ Greg Smith
Greg Smith

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of TEX. R. APP. P. 9.4 because it contains 6,693 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(2)(B).

2.  This brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in the proportionally spaced typeface using Word Perfect X5 in 14 point Garamond font.

Dated: November 3, 2015.

/s/ Gregory D. Smith
Gregory D. Smith

No. 12-14-00323-CV

_____

In the Twelfth Court of Appeals
Tyler, Texas

_____


David Tubb and Superior Shooting System, Inc.,
Appellants

v.

Aspect International, Inc. and James Sterling,
Appellees


_____

# APPENDICES
_____


A. PX55

B. Detailed Phone-Call Transcript Excerpts
   (PX55 & DX17, 18a, 19a, 20a, & 21a)

# APPENDIX A

# PX55

**PLAINTIFF'S**

**55**

1

Recorded Phone Conversation

Between James Sterling and David Tubb

12/31/12



2

MR. STERLING: Hello.

MR. TUBB: James?

MR. STERLING: Hey, David.

MR. TUBB: How are you doing today?

MR. STERLING: Well, it's raining like crazy. It's one of those days.

MR. TUBB: Well, it snowed here so I think the rain is okay.

MR. STERLING: Well, I had to cancel my class and we're getting ready for a group of people coming over tonight for New Year's Eve and -- you know how that goes.

MR. TUBB: Oh, yeah, yeah. Always watch the ball drop. That will work. Thank God it's already dropped in Sydney. I got to watch it.

MR. STERLING: Well, I haven't had a chance to watch TV today. I've been busy.

MR. TUBB: As far as meeting face-to-face, I think that's a great plan, you know. I -- I'm planning to go to the Safari Club show for a day or two.

MR. STERLING: Okay.

MR. TUBB: That's in Dallas.

MR. STERLING: Right.

MR. TUBB: So it doesn't really matter to me when we do it. I mean, obviously I need to be there. And

3

the traffic -- you know, I'm guessing, I don't know what (audio glitch). Hang on a second.

MR. STERLING: Sure.

MR. TUBB: Get rid of that problem. And that may not be the best spot either, you know, I don't know.

MR. STERLING: Yeah, I think that's probably as good as any since, you know, you're going to be there and it's within proximity and range of me, you know, and get my --

MR. TUBB: Sure.

MR. STERLING: -- get my attorney over there and try to hammer something out and, you know, move on with this deal.

MR. TUBB: Uh-huh.

MR. STERLING: Like I say, I --

MR. TUBB: Well --

MR. STERLING: I'm sorry that it -- I really am sorry this -- we've butted heads over this.

MR. TUBB: Yeah.

MR. STERLING: And I got my feelings hurt over something and --

MR. TUBB: Sure. Well, the main thing is no matter whatever it is, James, you know, you and I decided we were going to do a deal and 50 percent is 50 percent, you know. And it doesn't matter to me -- you know, my

4

big concern is where can we -- where is this most efficiently run from. Okay? And obviously today I think it's most efficiently run from -- from your -- from obviously where we have it. Okay?

MR. STERLING: Right.

MR. TUBB: There's no doubt. But if we get bigger, you know, one of the things that hurt my feelings too was I made a big deal about how close I was to the proximity of the railroad tracks, you know, since -- and you've got trains going by your house. So it's -- there's -- there's no necessarily advantage from a vibrational aspect from one stop to the other.

MR. STERLING: Well, I disagree simply because, you know, we tested that and the thickness of the concrete here was taken into consideration before I moved that thing in.

MR. TUBB: Well, I understand that. But there's no reason -- if we built a facility, you know, that you couldn't, you know, take that into account so -- but anyway.

MR. STERLING: Well, if -- I'm open to all considerations and if -- you know, we consider it and we continue to grow, you know.

MR. TUBB: Sure.

MR. STERLING: That's -- that's a --

5

MR. TUBB: Well, it's just like the same we're already dealing with is this -- you know, moving -- moving product back and forth, you know, so that will work for a while so -- and maybe it will work forever.

MR. STERLING: Well, it depends on -- and that's why, you know, I'm setting this thing up on a shoestring to keep the expenses down, otherwise, we're not going to have any profit to do anything with.

MR. TUBB: I agree.

MR. STERLING: You know.

MR. TUBB: I'm 100 percent on that deal.

MR. STERLING: Okay.

MR. TUBB: You know, and the other thing (inaudible) to talking about this trademark thing, you know, I have -- I got a dozen, 15, 18 trademarks, I don't know, and I didn't come up with all of them myself. I've used Zetiker (phonetic), I've used an old frien, Robert Massey (phonetic), I got one from Norhule (phonetic), I've used Zoo (phonetic). You know, and if I -- definitely if I had known it was going to be a big problem, I wouldn't have used (inaudible). Okay?

MR. STERLING: Yeah, and -- well, I was -- you know, I was going to just say, well, it's no big deal but then here's the deal. You know, my agreement was with you, okay, it was between you and me.

6

MR. TUBB:  Right.  That's true.

MR. STERLING:  And there's been some people interjecting into this that really hurt my feelings and all of the things they've said have been lies and cast suspicion and it hurt my reputation and it hurt my feelings.

MR. TUBB:  Right.  I understand that.  Well, and I didn't -- honestly, I didn't even know you had a web site.  Okay?  (Inaudible).

MR. STERLING:  Well, you know, I'm a separate -- you know, I am a separate company, David, and the web site was -- and I mentioned this to you.  I wanted that web site to look as though I was a separate company and not like this was just something between me and you because, you know, I do other business through that company also.

MR. TUBB:  Right.

MR. STERLING:  But I was -- it was my hopes to publish something on there about our collaboration and how, you know, we were manufacturing the ammunition for you and what a great deal it was and become a third-party advertising source for you that wasn't dependent on just your reputation but something I could market the ammunition through.

MR. TUBB:  Yeah.

7

MR. STERLING: There was nothing ever nefarious about that and but --

MR. TUBB: I guess it's just the fact I didn't know about it, you know, whatever.

MR. STERLING: Well, there's --

MR. TUBB: I mean, I'm over it, you know.

MR. STERLING: Well, I'm trying to get over it. The thing about me needing access to your -- and maybe taking out loans on your credit and having access to all of this stuff, you know, if you remember my e-mails to Linda Pitt, you know, that I have no need to see your personal information and told her to crank the security down where nobody sees that but you guys.

MR. TUBB: Right.

MR. STERLING: And so, you know, that hurt also.

MR. TUBB: Yeah, yeah.

MR. STERLING: But --

MR. TUBB: Well, there's several things we can discuss there. You know, I don't know that it's -- I mean, obviously I sent you an agreement, that was from my guy in Amarillo, you know, a rough draft, I suppose, you know.

MR. STERLING: Well, the blank document, you know, whatever is appropriate as far as the legal entity that I described to you from the beginning that would be

8

required, you know, and like I say, that's -- that's for a reason because that keeps the assets of the business within that -- separate from everything else.

MR. TUBB: Uh-huh.

MR. STERLING: And lays out a fair agreement between you and me where there's -- where there's no conflict.

MR. TUBB: (Inaudible) to be fair. I'm all over fair, you know.

MR. STERLING: Okay. Okay.

MR. TUBB: But anyway, you know, I don't know, I mean, obviously, you know, I don't -- I don't know that I -- if you're bringing your attorney, I don't know -- I'm not sure that that's -- I don't know if that's good or bad. Let's put it that way. Okay?

MR. STERLING: Well, you know, we have to -- we have to hammer out this agreement, you know, and, you know, I think that probably you should have your attorney there too so we could.

MR. TUBB: Yeah.

MR. STERLING: And see if that's possible.

MR. TUBB: Yeah, I know that won't work so...

MR. STERLING: Okay. Well, Let me -- let me talk to my attorney and see, you know, what we can do here. But, you know, you and I talk every day, you know, and

9

we can get eyeball to eyeball on this thing and that's fine too but we really need to -- to get that part of this arrangement behind us. Because it's like I said over a year ago, David, you know, good contracts make good friends so people don't forget things and you can go back to the contract and say that is what we agreed to.

MR. TUBB: Sure, uh-huh, yeah.

MR. STERLING: You know, and my attorney here is the same attorney that I tried to have you meet with at the shot show last year.

MR. TUBB: Okay.

MR. STERLING: And I've been -- I've been -- that's why I wanted you to meet him so we could get a contract together. That's how long this has been going on so...

MR. TUBB: Right.

MR. STERLING: But anyway, I'm sticking to our agreement, I'm still working, and fully intend to do what I said I was going to do.

MR. TUBB: All right. Enough said.

MR. STERLING: Okay.

MR. TUBB: Well, we need to -- we need to visit anyway, you know, it would be (inaudible).

MR. STERLING: Okay. Well, if nothing else, maybe I can get over there and meet you at the Safari Club and

10

--

MR. TUBB: Yeah, I need to talk to Howard too or something, sure.

MR. STERLING: Okay.

MR. TUBB: Maybe I'll, you know, bring a copy or something and let's do discuss some stuff, you know, I mean, I -- that's what we need -- you know, I mean, obviously we need -- we need to get an agreement if we're going to move forward on this, you know.

MR. STERLING: Yeah, I think --

MR. TUBB: No doubt.

MR. STERLING: I think that would be in both our best interests to go ahead and do that.

MR. TUBB: Yeah, I agree. You know, and -- not to poke, but we can't -- you can't do it if you want a venture agreement in Texas according to everybody I talked to. It's got to be a different --

MR. STERLING: Well, you can --

MR. TUBB: -- on a different animal.

MR. STERLING: You can but it may have -- it may have -- and like your attorney said, as far as indebtedness, they may apply. And I don't know if that's true but if it is and that's not the appropriate thing to do then I'm open to some other kind of agreement.

MR. TUBB: Yeah, well, my -- you know, Andy said that. Of course, obviously I was going to use Andy and Andy said that's not going to work and then, of course, this other attorney said that's not going to work. So, I don't know, that's not to say you can't work something out, that's right.

MR. STERLING: Well, that's why I said we need to just get our attorneys involved and let them work it out between them, you know, knowing what our desires are.

MR. TUBB: Right. Well, maybe we'll sit down and visit and kind of put some outline to it, you know, and do some -- I really haven't read the -- you know, what he sent me, the LLC or whatever it was.

MR. STERLING: Yeah, that's just -- yeah, it's pretty much blank boilerplate.

MR. TUBB: Yeah, so, anyway, I think that would be good, James.

MR. STERLING: All right. Well, I'll be in touch and we'll just keep moving forward, David.

MR. TUBB: Yeah, I think this thing is Thursday, Friday, Saturday, something like that. Okay?

MR. STERLING: Is that next week or this week?

MR. TUBB: No, it's this week I think.

MR. STERLING: Okay. Let me see what I can do.

MR. TUBB: This coming -- this coming week, yeah.

12

MR. STERLING:  Yeah, Let me look at my schedule and see what I can do.

MR. TUBB:  All right.  Very good.

MR. STERLING:  Okay.  All right.

MR. TUBB:  All right.

MR. STERLING:  Bye.

(End of audio recording.)

13

THE STATE OF TEXAS

COUNTY OF DALLAS

I, LEICA TURNER, Certified Shorthand Reporter for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription, to the best of my ability, from the audio recording as provided to me.

I further certify that I am neither attorney for, related to, nor employed by any of the parties to the lawsuit in which this recording was taken. Further, I am neither related to nor employed by any attorney of record in this cause; nor do I have a financial interest in the matter.

Certified to on this the 8th day of April, 2014.



_____
LEICA TURNER, CSR NO. 5622
Registration Expires: 12/31/15
Firm Registration No. 266
SUNBELT REPORTING & LITIGATION SRVCS
100 E. Ferguson Street
Suite 900
Tyler, Texas 75702
Phone: 903.593.3213



1

Recorded Phone Conversation

Between James Sterling and David Tubb

01/04/13

2

MR. STERLING: Hello.

MR. TUBB: Morning.

MR. STERLING: Good morning.

MR. TUBB: How are you doing?

MR. STERLING: Oh, trying to get caught up here. What's going on?

MR. TUBB: I didn't know if you ever come up with maybe a time or something. I'm down here for the Safari Club show.

MR. STERLING: No.

MR. TUBB: If you wanted to try to get together.

MR. STERLING: No. Yeah, yeah, the purpose of me trying to get together with you face-to-face is try to, you know, get my attorney over there and maybe draw up some kind of agreement. But if we can't do that, then there's no sense in me coming over.

MR. TUBB: Okay. Well, I mean, obviously I would be happy to visit, you know, there's no question about that.

MR. STERLING: Well, you know, we talk all the time on the phone, you know.

MR. TUBB: Sure. Oh, I agree. Yeah, we do. Absolutely, yeah, yeah. I want to make sure that's (inaudible). Well, maybe we ought to just sit down and budget some time or something, sit down, and, you know,

3

visit and we'll go back through and, you know, reiterate and cover our points and see if we can move forward here, you know.

MR. STERLING: Well, I think that's probably what we ought to do. I think that something has happened somewhere along the way and we're -- trying to keep my bearings here and do, you know, exactly everything that I said I would do per our agreement and I don't -- I don't think you're really happy and I don't want you to be unhappy and --

MR. TUBB: Sure, yeah.

MR. STERLING: So whatever we got to do here, we got to do.

MR. TUBB: Well, what -- you want to try to visit Monday or something like that? I'll jot some notes down and stuff.

MR. STERLING: When?

MR. TUBB: I don't know, Monday? Would Monday work for you?

MR. STERLING: Yeah, Monday is fine.

MR. TUBB: Okay. Why don't we do that. So I'll work on that. About 10:00 or something, that way I'll have everything hopefully out of the way and (inaudible) will work for you, I'll -- we'll call.

MR. STERLING: That will work.

4

MR. TUBB: Okay. That sounds great. Thank you, James.

MR. STERLING: I'll put it on my calendar.

MR. TUBB: All right.

MR. STERLING: Bye-bye.

(End of audio recording.)

THE STATE OF TEXAS

COUNTY OF DALLAS

I, LEICA TURNER, Certified Shorthand Reporter for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription, to the best of my ability, from the audio recording as provided to me.

I further certify that I am neither attorney for, related to, nor employed by any of the parties to the lawsuit in which this recording was taken. Further, I am neither related to nor employed by any attorney of record in this cause; nor do I have a financial interest in the matter.

Certified to on this the 8th day of April, 2014.



LEICA TURNER, CSR NO. 5622
Registration Expires: 12/31/15
Firm Registration No. 266
SUNBELT REPORTING & LITIGATION SRVCS
100 E. Ferguson Street
Suite 900
Tyler, Texas 75702
Phone: 903.593.3213



Recorded Phone Conversation

Between James Sterling and David Tubb

01/07/13

2

MR. STERLING: Hello.

MR. TUBB: Hey.

MR. STERLING: Yeah, David. Hello?

MR. TUBB: Can you hear me?

MR. STERLING: Yeah, I can hear you.

MR. TUBB: Do you hear me?

MR. STERLING: Yeah, I hear you.

MR. TUBB: Okay. I didn't think you did there for a minute.

MR. STERLING: Gotcha.

MR. TUBB: Okay. So I had -- I wanted Sue to visit, you know, our conversation. She's part of all the things I do so I've got her sitting here with me.

MR. STERLING: Okay.

MR. TUBB: And I just -- are you recording this?

MR. STERLING: Yes, I am.

MR. TUBB: So when we get done with whatever, maybe we can send -- anyway. I thought we ought to visit a little bit for today, tomorrow, or the next day and kind of -- I'm really going to try, James, on my part. I hope -- you've invested a lot of time in this so...

MR. STERLING: I sure have.

MR. TUBB: So have I, you know. No, the -- I guess I may be unclear on some things. I truly have not deviated ever from half the net profits to half the net

3

profits.  I'm still holding on that.  And I thought that that was what we had with you, you know, so -- any comment about that?

MR. STERLING:  No, that was our understanding.

MR. TUBB:  That's what I thought too.  So, you know, every -- every agreement or every -- every joint venture that I've done or partnership or whatever it was, typically nobody got paid until we had a sale.

MR. STERLING:  Hang on a second, David, I've got somebody at the gate

MR. STERLING:  Hello?  Hey, come on in. I can't come to the phone.  Can you leave it by the garage?  Thank you.

MR. STERLING:  I'm sorry, go ahead, David.

MR. TUBB:  That's okay.  You know, every -- every partnership sort of deal that I've ever been in, nobody got paid until we had sales, you know, that's the way I perceived it.  Do you concur with that?

MR. STERLING:  My agreement was that I deferred all my time and expenses as equity in the joint venture and so I was expecting to manufacture the ammunition per agreed for 50 percent of the net profit.

MR. TUBB:  Absolutely, that's, yeah, understood and I see nothing wrong with that (inaudible).

MR. STERLING:  Okay.

4

MR. TUBB: You made the comment one time I noticed in one of your e-mails or something you were, I don't know if -- but really interested in attaching a lien on those machines.

MR. STERLING: No, I don't think so.

MR. TUBB: Okay.

MR. STERLING: I don't think that I would be interested in doing that. If -- if -- my -- like I say, my agreement was that I would defer all of my time and expenses in equity in the joint venture. And if there is no joint venture then that doesn't apply. But the machines, you paid for them, if you want to take them out of here tomorrow, you know...

MR. TUBB: Okay. Understood. Well, I know at one time you'd made the comment like down the road or something, you know, you'd like to buy half of them at one point

MR. STERLING: No. You approached me and wanted to know if I would buy half of them and I said that I would out of the profits of the business at some point --

MR. TUBB: Yeah, I understand.

MR. STERLING: -- where it starts to offset the value of my time that I'm invested in. It's been over a year now and there's been no income.

MR. TUBB: I understand.

5

MR. STERLING: And my time keeps adding up, so, yeah, I would need to start having some income to justify my time and then --

MR. TUBB: I understand.

MR. STERLING: -- apply some of that to -- some of the profits to half the equipment. And I think we mentioned that and documented that in my email too so...

MR. TUBB: So what is your time at this point? What's the value on your time at this point in time?

MR. STERLING: Okay. We've got $35,000 that -- approximately that was deferred on the San Diego Media project. And those are invoices that I promised to send Sue and I haven't yet and I will send them.

MR. TUBB: Okay.

MR. STERLING: And then all of my time for -- as it relates to the ammunition loading project. As you know, all of your -- all of your -- all of the work I do are divided up by project. There's the web project, there's the San Diego Media project, there's this project. And I track all of that time. I would have to total all of the time that I've invested in this, this year, but it's a high number.

MR. TUBB: What's your hourly -- what's your hourly rate, James?

MR. STERLING: It's $140 an hour as -- pretty much

6

-- it's the same rate that you've paid me on everything.

MR. TUBB: So (inaudible).

MR. STERLING: It's not like -- it's not like I'm asking you for more money for this project or I'm applying a higher rate at this project. It's the same -- same rate for all of the projects.

MR. TUBB: (Inaudible) diverge for a minute, where are we on our -- our Zuvie (phonetic)?

MR. STERLING: On the Zuvie web site project? Is that what you're asking? David?

MR. TUBB: Just a brief synopsis. Are we even -- are we -- have we done any movement there or are we a month away or should I give up and piss off my 8,000 bucks or (inaudible) --

MR. STERLING: There -- right now we're in a holding pattern because I'm kind of waiting to see where we're going on this and whether or not you want me to continue to work on anything else and whether I will work for anything -- on anything else. They're waiting on me to provide them with product data to -- I have to extrapolate and strip the SKU numbers and product information out of the current web site and give that to them to create a new web site. So if that moves forward, then I'm estimating probably it could be done

7

within maybe 30 days. The timing on that was set up to coordinate with Linda Pitt and the new company file that would integrate into it.

MR. TUBB: Right.

MR. STERLING: And so, of course, the overall or overarching purpose of that was to give us clear data for our joint venture together as far as tracking all of the expenses and sales related to ammunition.

MR. TUBB: Absolutely, I understand.

MR. STERLING: But you get the -- you would get the added benefit of having a bookkeeping service that would be able to give you clear data on your own sales and everything should work, you know, a thousand percent better. But I'm -- after seeing the email between Sue and your accountant which allegations were made that weren't true, I don't know whether I want to -- I don't know where I'm going with that but...

MR. TUBB: Okay. Well, at this point in time, you know, we've engaged Linda Pitt, paid a couple of invoices, so maybe that's -- I don't know either, James.

MR. STERLING: Well, like I say, I don't know if -- if they become aware of this, I'm sure that they're going to withdraw. And the comments made in that e-mail, I would feel fairly certain that the owner of that company would probably end up suing your accountant

8

for tortious interference.

MR. TUBB: I don't have a clue what you're talking about. What exactly are we referring to, James?

MR. STERLING: Well, again, I have absolutely no -- I picked them from -- at random.

MR. TUBB: Right.

MR. STERLING: I get no kickbacks, I get no commissions, nothing from them. I don't -- also I don't have any access to your personal information. In fact, you and I had a conversation about this and the -- and I confirmed it by copy of email to Linda Pitts that, you know, I don't need to see anything other than what's related to the joint venture as far as instructing her how to set up the security standards on that. So you guys control who sees what.

MR. TUBB: Well, the point, I mean, you know, if we continue on this, obviously you need to see -- you know, you need to see invoicing and costs and, you know, so on and so forth.

MR. STERLING: That's correct. And, you know, Linda can get that to me by report in some -- in some way or we can figure out some process there, but as far as me being interested in your personal data or wanting to take out any loans against your business or anything like that, that's -- those are scurrilous accusations

that are kind of hard to swallow.

MR. TUBB: "Scurrilous" is a big word. I don't know what that means.

MR. STERLING: Well --

MR. TUBB: Okay.

MR. STERLING: I guess you need to decide what you want to do. Do you want to move the machines to Canadian now and --

MR. TUBB: Well, here's the question I've got: If we continue to try to do this -- obviously I'm still in for doing this, however the veil appears, somebody needs to keep track of the sales and working that end of it. That's an end that I can't keep up with. Okay? I have too many other things I'm doing, James, and I think you know that, you know.

MR. STERLING: Yeah.

MR. TUBB: I honestly think that the program that we bought where you can -- like you had a poker in there, you know, that you trained an operator and set it in motion and put some (inaudible) in there where you could view what's going on, a software glitch or something that -- the other advantage with that is for the economy of scale. If we're shipping stuff there, I'm not going to charge us for storage or anything of loading ammo or powder -- and I think I can probably

10

store powder easier than you. You know, you have a bunker there. Anyway, for what's that all worth, (inaudible), you know, and the one thing -- and I mentioned that to you earlier was the fact that I made a big deal about the railroad crossing and nobody ever mentioned railroad to me on -- you may -- I'm sure you don't as much traffic as I do, and we have a 2-foot, you know, foundation, well, bringing 2-foot foundation is not that big of deal on my side either, you know.

MR. STERLING: Well, okay, first of all, let's -- that's -- I think your memory may be a little hazy and let me back up to the point to where, you know, we had -- we made this agreement. And that is that -- I vaguely recall some mention of whether the machines should be up there or not and I did mention that you had a railroad track there, I knew it would be sensitive to that.

MR. TUBB: But, you know, they were talking about --

MR. STERLING: Okay. Let me finish.

MR. TUBB: -- seismic vibrations, you know.

MR. STERLING: Right. I knew here it was not going to be an issue. Marshall said that my location was as stable as any nuclear facility he's ever been in. So that's -- that's not the issue. But the issue was that

11

-- and the reason the machine is here today is because I don't live in Canadian. I'm the manufacturer. So if the machine goes to Canadian, then I'm no longer the manufacturer so...

MR. TUBB: Understood. I don't know, James, about that. I mean, I think -- I think in the -- I think in the end game if we looked at this going a couple of years down the road, if we had other machines, it would have made more sense to have it in Canadian.

MR. STERLING: Well, perhaps. But, you know, what I'm not hearing in this conversation or I haven't heard in a long time and -- you know, I'm in this to make money, that's --

MR. TUBB: Absolutely.

MR. STERLING: -- why people -- why people get into business. And, you know, I've bent over backwards, it's been, you know, a lot of time and you've spent some of your time to get a product that's manufactured to your specs. It's your ammunition, you know. And I'm not -- we're right in the middle of a time where ammunition is one of the hottest commodities there is on the planet. And what I would -- what I wanted to hear is, James, how can I help you and what can I do to get us to get this product out the door and I haven't heard any of that. And it seems to be more of a conflict about where the

12

machine is than anything else. And, you know, you and I have already discussed as far as shipping that there's no sense in paying shipping twice and me manufacturing ammunition and then shipping it back to you to use so you can send it out to your distributors. You know, we would -- we would --

MR. TUBB: Not unless there's a trip involved and I'm coming down there anyway, you know.

MR. STERLING: That's right. That's right. And there will -- I can foresee an occasional trip, okay, that we would have to work out some logistics, but there's no reason why all of the product, all the materials can't come here. You can keep powder up there if you want to, otherwise, I'll make arrangements to keep it here. But it's -- those are -- those are logistical problems that are normal in any business setup. The -- as far as the tracking of materials and expenses and things like that, again, you have a very powerful piece of software with -- and with Advanced Inventory installed, you can actually look at this facility as a remote warehouse and be able to see exactly what I have in stock at any given time and Linda can set that up for you. This is pretty much the mechanics of how things work. It's really, like I say, it's something to be worked out between us on what best

13

functions for both sides.

MR. TUBB: Understood.

MR. STERLING: And I'm not -- I'm not here saying, you know, it's going to be this way and that's -- that's the end of it. I've always been open to saying what is the best solution and what works the best for both of us, you know.

MR. TUBB: I agree. I told you I really don't want to load ammo. You know, obviously I want, you know, my trade secrets and several things on those tool edge, you know, and --

MR. STERLING: Sure.

MR. TUBB: Nobody -- nobody is loading ammo on a .50 and there's a reason why.

MR. STERLING: That's correct.

MR. TUBB: Nobody has figured out how to do the ammo.

MR. STERLING: That's correct.

MR. TUBB: I just don't know if I can afford you, James.

MR. STERLING: Well, you know, I have -- I have a pretty deep hole to dig myself out of here for this last year and unless I see a whole lot of ammunition coming in here to load, you know, we've got a problem.

MR. TUBB: Well, what do we do if we load a lot of

14

ammo and it doesn't go out the door?  I've got -- let's say I've got 30, $50,000 worth of inventory?  I don't know, I'm just bouncing that off of you, you know.

MR. STERLING:  Well, there's all different kinds of ammunition we can load, David.  If you're -- if you're just concentrating on precision ammunition, a very -- it's a very narrow niche of the market.  You know, I'm sitting here, have people come in from a gun show yesterday here in Tyler and the .223 ammo is being -- you know, they're selling that stuff for $1,200 a thousand.

So there's a lot of -- the money that could be made right now if we had the materials to do so, and, you know, I mentioned that to you before by email.  There's a lot of different things we could be doing because the machine should not be sitting idle in any way, shape, or form.  But if you want to make money, there's -- you know, that's why we're here and that's where we've been trying to get to.

And if you -- if you limit your market and if you say, well, I'm only going to sell one thing because it's so synonymous with what I consider to be, you know, the best possible product for long-range shooting, then that's a very narrow market to go into. You can -- you can sell that and you can sell other

15

things and it doesn't even -- you know, like I said, it doesn't even have to be necessarily sold through Superior Shooting Systems. It can be sold on a contract. And as long as you're doing the provisioning -- and I said this from the beginning -- it doesn't matter who it's being sold to, whether it's by you or by me, we split the profits 50/50.

MR. TUBB: I understand that.

MR. STERLING: You know, so --

MR. TUBB: Never been an argument on my side at all.

MR. STERLING: Okay.

MR. TUBB: Well, let me give it some thought, James. Okay?

MR. STERLING: All right.

MR. TUBB: (Inaudible) positive.

MR. STERLING: Okay. Well, we're getting to the point where, like I say, it's getting -- this is now 2013. I promised Sue some invoices for all of -- your paid invoices on computer work this year and I'll send those out later today. And the San Diego Media project, I think that needs to go ahead and get paid one way or the other and you need to look at that and let me know whether you're going to pay it or not. All right?

MR. TUBB: All right.

MR. STERLING: Okay. You think about it and let me know which direction you want to go. I think that if this moves forward, I think -- and I've been -- David, I've told you this from day one. The good contracts make good friends. And I've been trying over and over again to get some agreement in writing so that we don't -- because that -- agreements in writing, you don't have these conflicts. You don't have miscommunication. Everybody knows what their job is and what their responsibilities are. And if somebody forgets something, then you can go right back to the contract and say this is what we agreed to, you know.

MR. TUBB: Well, James, I guess I was blindsided from the fact that I don't have a consulting agreement with you. Okay? Every joint venture I've ever been on obviously where the money is getting split into parts --

MR. STERLING: Well, you can't -- David, you can't have it -- you can't have it both ways. Either we have a joint -- we have an agreement or I'm just an hourly paid employee and there -- you can't have it anywhere in between because I don't work for free. No one does.

MR. TUBB: Evidently I do.

MR. STERLING: Well, that's -- you really don't because you have your own business and that's what businessmen do.

17

MR. TUBB:  Well, I'll give it some thought, James. I'll -- you going to be around this week, I'm sure?

MR. STERLING:  Sure.

MR. TUBB:  I'll try to call you tomorrow.

MR. STERLING:  Okay.  Thank you, David.

MR. STERLING:  He doesn't need a consulting agreement with me.

(End of audio recording.)

18

THE STATE OF TEXAS

COUNTY OF DALLAS

I, LEICA TURNER, Certified Shorthand Reporter for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription, to the best of my ability, from the audio recording as provided to me.

I further certify that I am neither attorney for, related to, nor employed by any of the parties to the lawsuit in which this recording was taken. Further, I am neither related to nor employed by any attorney of record in this cause; nor do I have a financial interest in the matter.

Certified to on this the 8th day of April, 2014.



LEICA TURNER, CSR NO. 5622
Registration Expires: 12/31/15
Firm Registration No. 266
SUNBELT REPORTING & LITIGATION SRVCS
100 E. Ferguson Street
Suite 900
Tyler, Texas  75702
Phone:  903.593.3213



Recorded Phone Conversation

Between James Sterling and David Tubb

01/08/13

2

MR. STERLING:  Hello.

MR. TUBB:  Can you hear me?

MR. STERLING:  Yeah, I can hear you.

MR. TUBB:  Okay.  I got your bill that you sent.

MR. STERLING:  Okay.

MR. TUBB:  I had some other questions on another subject.  Okay?  I talked to Kerrigan and had him did a little -- had him do a little bit of looking (inaudible), same thing, about domain, domain names and domain ownership.

MR. STERLING:  Right.

MR. TUBB:  And I think this -- I do remember you mentioning something about -- you didn't use the word "poisoning the well" but basically that's what you were referring to with that.

MR. STERLING:  You mean as far as Sue Tubb and Marilyn Alt's email?  Yeah.

MR. TUBB:  Yeah, so I thought you were referring to these domain names.  You know, at this point in time, you're listed as the administrative contact or whatever for davidtubb.com and (inaudible).com.  I know we did the Go Daddy, email, so on and so forth.

MR. STERLING:  That's right.  I set that up.

MR. TUBB:  In the QuickBook accounts info, I believe it shows you as the owner of that or whatever,

3

the administrator, and, you know, I think that obviously you should be the contact, but I'm also -- on those particular items, I think I should be the administrative contact.

MR. STERLING:  That's fine.  I have no problem with that.

MR. TUBB:  If you could work that in that (inaudible) schedule.

MR. STERLING:  You want me to do what?

MR. TUBB:  I said when you can do that, that would be great.  Okay?

MR. STERLING:  Okay.

MR. TUBB:  I don't know what that's going to require.  I don't think it would take (inaudible). That's -- Kerrigan said that we need to do that, that needs to be done and I would agree so...

MR. STERLING:  Okay.

MR. TUBB:  You know, I've looked, I thought back and forth, and obviously, you know, I've paid you along as we go, you know, when we're doing some of the -- I don't know that I've paid you for anything we've done with Linda Pitts but obviously I've paid you for San Diego Media on times and, of course, I can't pay you until I get a billing statement.  I -- (inaudible) I've looked at pages there.  Every time I call you you're

billing me, you know. And, you know, I could understand that on stuff that has to do with QuickBooks or Go Daddy or San Diego Media or, you know, stuff like that, but when we have a -- when you and I engaged in this -- in this, you know, venture to do this ammunition, James, I don't -- I really don't see that (inaudible) on -- if we're both trying to do the same thing, you know, or working to the same end so I'd like you (inaudible).

MR. STERLING: The billing I sent you for 2011 is all related to San Diego Media and that nightmare that you kind of walked into in getting that thing up and running.

MR. TUBB: And, you know, to reiterate, you're the one that encouraged me to go outside. Obviously I did. Probably didn't make a very good, you know, (inaudible). But when I -- when I add all those -- I think I told you, when I add all that stuff up, the initial cost and the monthly service and, you know, and now the additional billing, the other billing, you know, it certainly doesn't look like it was a very good deal.

MR. STERLING: No, it wasn't, it wasn't. And I certainly didn't know going into it that it was going -- you know, that San Diego Media didn't have the assets to make that happen for you and that it simply wouldn't have happened if I hadn't have done that work so...

5

MR. TUBB: And I would really like to know just a cost estimation, you know, within a -- just a guess on what's it going to cost us to (inaudible) here forward. You know, I will not hold you to it but I would like to know. Is it going to cost me another 10,000 bucks, is it not, or is it going to be more than that or in the way of hours?

MR. STERLING: To get what done, David?

MR. TUBB: To get the switch from San Diego Media to Zuvie (phonetic).

MR. STERLING: Honestly, I don't think it would be more than -- just off the top of my head and don't hold me to this because I don't think what I'm getting into, but I don't think it would be more than $1,000 or $2,000.

MR. TUBB: Okay.

MR. STERLING: I certainly don't intend to bill any more than the actual work that I'm doing. You know, all of my bills are fair and if anything, you've been underbilled.

MR. TUBB: Yeah, well, I don't know that your -- I know your rate has changed now.

MR. STERLING: In 2011, it was $120. You were basically getting a friend's rate. In 2012 -- I've always kind of treated you as though you didn't have any

6

money and I've treated you that from the very beginning is why I've been so friendly in that regard. But in 2012, I realized that you do in fact have money and you can afford to pay your bills and...

MR. TUBB: Yeah, understood. I usually pay my bills, you know, anyway...

MR. STERLING: I guess what we need to figure out here, David, is, is whether we're going to move forward or not. And I've pretty much talked myself out on this deal. You know, the San Diego Media bill I sent you yesterday, either you're going to pay or you're not and you just need to let me know one way or the other and then --

MR. TUBB: Well, from your perspective, James, if you -- if you had a bill and it showed up two years later, would you feel -- you know, would you say, hey, you know --

MR. STERLING: Well, you remember the work that was done, David, and I told you when you were -- I told you when you were here in Tyler that I'd set that aside and gave you the opportunity to make some money in ammunition with another idea.

MR. TUBB: I understand, James. I'm not arguing that. I (inaudible) a bit. But that's -- you know, it's kind of like -- it would be on my side if you go,

7

well, your bill this year for the -- for this product development, joint venture, whatever, is astronomical and it's like, holy smokes, if I had known you were billing me on that sort of thing, I probably wouldn't have done it if I knew it was going to be that much, James.

MR. STERLING: Well, like I say, my time has been applied to this joint venture as equity. You agreed to that. If we're going to have a falling out, then it's going to get addressed because I work for a living. And I can't just set up an entire operation for you and then say, here, David, you don't owe me anything. So if we're going to have a falling out and a parting of the ways, then we need to figure some way out of this.

MR. TUBB: I understand that. I agree, James.

MR. STERLING: So the way I see it is really very simple, you know, is if -- the only way we can move forward and you not pay me for my time this year is with a signed contract in which we go into the ammunition business and move forward with what we agreed to do and make some money. If that doesn't happen, then we're going to have a parting of the ways and there's going to be some fallout to that because I'm going to get paid one way or the other.

MR. TUBB: Well, yeah, I understand what you're

(inaudible).

MR. STERLING: It's really up to you. If you -- if you want to -- like I say, if --

MR. TUBB: Well, James, I feel -- you know, I want to do the ammo thing. I just -- I just think that what you did is not what I would have done. Okay? I would have been up front and say I'm going to bill you for this whole thing, this is my rate and this is how much (inaudible) on this. Obviously you have an idea about what I have in it, you know, and, you know, in my opinion, you're worth your 140 bucks an hour, 120 bucks an hour working on these QuickBooks and working on San Diego Media and all that stuff, but this joint venture thing, I don't think -- I don't think that that was -- that that's a prudent figure. Okay?

MR. STERLING: I have literally thousands of hours of my time into this project. And, like I say, if you want to have a parting of the ways, then you can get your equipment out of here and we can -- we can move on. But I need to move on to other projects.

MR. TUBB: What would you prefer?

MR. STERLING: I keep my word, David. I told you that. Even if -- even if we've had some real problems here, you know, I'm willing to move forward but I'm not going to do it without some kind of written contract

9

with you and we should have done that from the beginning.

MR. TUBB: Yeah, we really should have.

MR. STERLING: I've said that over and over and over again, tried to --

MR. TUBB: Well, James, you wanted to do the joint venture and I will tell you that everybody I've talked to on my -- said that's -- the way you had your joint venture constructed (inaudible) and/or the fact that you can't use a joint venture very well in Texas.

MR. STERLING: That's fine.

MR. TUBB: That's what all my counsel said.

MR. STERLING: That's fine. And I said that I'm more than willing to do whatever is appropriate. I told you that. In fact, I'll take you back in time to where you called me in your truck one day and you said, James, I'm not trying to steal your idea or anything but if this thing gets big, then we're going to need somebody to manage it. And I said, David, I want to be real careful here, I don't want to be an employee of Superior Shooting Systems.

MR. TUBB: Well, James, I don't -- I don't want to load ammo. Okay? I've told you that.

MR. STERLING: Okay.

MR. TUBB: I do not want to load ammo.

10

MR. STERLING: Well, at that time, you said, fine, we'll form an LLC or something like that and you didn't sound very happy about it and I said okay.

MR. TUBB: And I am. I guess the key is what we're taking into it. I don't know, did you read that LLC, the one I sent you that came from Ruben?

MR. STERLING: Yeah, it was blank so none of our agreement was in there. So, yeah, an LLC would be fine but our agreement as we have documented it over the period of this last year would have to be put in there and agreed to by both sides.

MR. TUBB: That's right. And that may be very hard for us to do. I don't know.

MR. STERLING: It might be. It might be.

MR. TUBB: I don't know. It may be.

MR. STERLING: But until I'm talking to your attorney, you know, I don't know.

MR. TUBB: Yeah, I understand.

MR. STERLING: But that's where we are.

MR. TUBB: Right. Well, what is the status on these boxes?

MR. STERLING: They're printed. They're printed and they're waiting UV coding and they'll be shipped on the 15th or 16th.

MR. TUBB: All right. Well, I think we've got a

11

lot of stuff (inaudible).

MR. STERLING: Well, you haven't really made decisions though that I hear. And, like I say, I don't want to just keep --

MR. TUBB: Well, we don't have -- we haven't -- we haven't talked about what we're bringing into the thing, you know. You're bringing in a two hundred -- or whatever, your big bill that you've got for all your consulting, you know, and maybe that evens you up. I don't know what (inaudible). I don't know. I don't know. I just don't have a -- it doesn't quite sit with me. The rest of your billing, I don't have -- I have zero issues with that.

MR. STERLING: All right. Does that mean --

MR. TUBB: (Inaudible).

MR. STERLING: Does that mean -- does that mean you're going to write me a check for the San Diego Media project bill I sent you yesterday?

MR. TUBB: I will.

MR. STERLING: All right. All right. David, I would suggest this. Obviously my time is worth something. All right?

MR. TUBB: I agree. There's no doubt about that, James, I agree.

MR. STERLING: All right. As to what that value

12

is, we'd have to put it in a contract and see what sticks in your craw. All right? But I'm not going to put myself in a position to where you hold all the assets and then I end up being some kind of employee even though I'm not. All right? Because this is a mutual agreement and my time do have -- does have value.

MR. TUBB: It does.

MR. STERLING: I bring a lot to the table and I've done a lot of work on this deal to make it happen and it simply wouldn't have happened otherwise. But who's going to be your attorney that's handling it? Is it going to be the guy in Amarillo?

MR. TUBB: Yeah, (inaudible). I think so. He's a very good business attorney.

MR. STERLING: Okay. Well, I would suggest that -- that -- you know, I imagine he's probably seen that sample joint venture agreement that I had sent to you previously that Andy looked at.

MR. TUBB: And he -- he was just like Andy. He said it's not a good one.

MR. STERLING: Okay. Well, that's fine. As far as --

MR. TUBB: That's what he said, yeah.

MR. STERLING: But that's simply a boilerplate joint venture agreement. I made that clear from the

13

beginning. You know, i've always recommended C corp or an LLC and when you were here in Tyler, I told you that there's a reason you have a separate legal entity that holds the assets of the agreement. All right? There's a reason for that. And a joint venture agreement is valid in Texas, but if there's a better agreement out there, if you want to just do a straight LL- -- LLP or something like that, then we can get our attorneys on it and see what we can come up with.

MR. TUBB: Well, I think that's (inaudible).

MR. STERLING: Okay. Well --

MR. TUBB: I have -- you know, obviously next week I'm going to visit with several people. Obviously we can't -- we can't make any money if we don't have product so...

MR. STERLING: Well, I think you would have to be pretty inept to not to be able to sell ammunition in this market. But like I say, it's pretty much a golden opportunity if you can get the materials. So there's a lot of money to be made and whatever -- whatever your time is worth, my time is worth, or your investment, that's really a -- that's really pretty small change in the money that can be made here.

MR. TUBB: I would agree, you know, (inaudible) and produce product and we're able to move it.

14

MR. STERLING:  Yeah.  Well, like I say, I can load the ammunition and I can ship it and that's pretty much what I want to do.  So I'm willing to move forward with you.  I'd like to -- I don't want to fight with you, David.  It makes -- it upsets me and I've got better things to do with my time but...

MR. TUBB:  Okay.  Well, I'll ring you tomorrow. Okay?

MR. STERLING:  All right.

MR. TUBB:  (Inaudible).

MR. STERLING:  All right.  Thank you.  Bye-bye.

(End of audio recording.)

15

THE STATE OF TEXAS

COUNTY OF DALLAS

I, LEICA TURNER, Certified Shorthand Reporter for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription, to the best of my ability, from the audio recording as provided to me.

I further certify that I am neither attorney for, related to, nor employed by any of the parties to the lawsuit in which this recording was taken. Further, I am neither related to nor employed by any attorney of record in this cause; nor do I have a financial interest in the matter.

Certified to on this the 8th day of April, 2014.



_____
LEICA TURNER, CSR NO. 5622
Registration Expires: 12/31/15
Firm Registration No. 266
SUNBELT REPORTING & LITIGATION SRVCS
100 E. Ferguson Street
Suite 900
Tyler, Texas  75702
Phone:  903.593.3213

Recorded Phone Conversation

Between James Sterling and David Tubb

01/09/13



2

MR. STERLING:  Is that better?

MR. TUBB:  I think so.

MR. STERLING:  Okay.

MR. TUBB:  (Inaudible) let you know we're going to (inaudible).

MR. STERLING:  We're going to what?

MR. TUBB:  Get you a check.

MR. STERLING:  Okay.

MR. TUBB:  This -- I have just a couple of questions on this billing.  You did a lot of them on certain dates.  You just have a cumulative time total and then that just happened to be the date you invoiced out stuff?

MR. STERLING:  It was in the very beginning because there was catch-up.  There was a couple of weeks there where I had to go back and make the entries in the very beginning.

MR. TUBB:  Okay.  The one that sticks out most is at the very end.  There's five invoices on one day.

MR. STERLING:  I don't know.  I would just have to look at it.  The time is correct.  Like I say, if anything, it's -- it's less than I actually worked on that deal.  I was swamped on it, on all of it so you --

MR. TUBB:  (Inaudible).

MR. STERLING:  You remember that that was --

3

MR. TUBB: (Inaudible) a mess.

MR. STERLING: It was a mess.

MR. TUBB: Yeah. Anyway, if you (inaudible) talk to Michael about it yesterday so...

MR. STERLING: Yeah, like I say, when I get that check, I'll start the process. There's probably some other things too where my name and contact information may be in there that I'll have to change all of that too.

MR. TUBB: He said it would be a little -- it would be a little more involved than just -- on some of it.

MR. STERLING: Yeah, it always is, David. It just always is. And getting you switched over from -- we're still not quite out of that San Diego Media mess and they've actually got, like I say, control of that web site even though the domain is registered with Go Daddy. And I've got to be real careful about how I get that transferred over on the new web site to keep them from interfering with any transfer and that kind of thing so...

MR. TUBB: I guess that brings me to another question. If we only have another hour or two of work with Zuvie (phonetic), can we move on that? I mean, is that appropriate?

MR. STERLING: Well --

4

MR. TUBB: I mean, I'd like to get that thing up before, you know, you got to start loading ammo, you know.

MR. STERLING: Yeah, and I agree. I agree. Like I say, the timing on all this kind of sucks because of everything having to be done at one time. There's more than just an hour or two of work to do. What I might be able to do, David, is -- I don't know how long it's going to take me to extract that data off your current site and I have to get that to their project manager and then they have to start their design work. It's probably -- I don't think they're super speedy, but I'm guessing probably three weeks maybe, maybe four, before the site was ready and that we could switch over. When the site is up and ready to go, when we're ready to incorporate a new company file and get that -- get Kerrigan to install that locally for you, there's a desktop application that manages all of the orders as they're brought into the new company file and that will have to be installed. I will try to transfer as much of this time over to Kerrigan as I can. It might be a little bit cheaper for you.

MR. TUBB: It will be.

MR. STERLING: Okay?

MR. TUBB: Yeah.

5

MR. STERLING: I'm not trying to stick it to you, if you know what I mean, I'm just trying to do whatever is going to make this thing work.

MR. TUBB: Well, I'd like to get it done because, I mean, I would rather have the site up and running, pay San Diego Media for their last month and walk away, you know.

MR. STERLING: I understand.

MR. TUBB: That's really -- you know.

MR. STERLING: All right.

MR. TUBB: And, you know, and the Linda Pitts thing, I mean, I don't know where that is. I haven't talked to her recently, but if that transfers over at that point in time, great; and if it doesn't, well, I guess it will go a different time. So I don't -- I don't know. I really don't see the big deal doing that, you know, getting the QuickBooks flipped over, but maybe --

MR. STERLING: Well -

MR. TUBB: At this point in time, just dump your old one and buy (inaudible) your data and start moving forward, you know.

MR. STERLING: Okay.

MR. TUBB: I don't know, I mean...

MR. STERLING: Well, she's -- like I say, she's got

6

all your books balanced now so -- and it's all ready to go as far as I know and so you would have accurate numbers and then everything would work as I pretty much described it would. But if you're going to be drawing your orders into this, it needs to be with a new web site that's designed to work with QuickBooks properly and San Diego Media isn't. You kind of want all of that to happen at the same time.

MR. TUBB: Yeah.

MR. STERLING: So bringing her -- bringing her in with a new company file is not going to be a problem because most of her work is done I understand. She's waiting on a SKU number scheme-up from me as to tracking the ammunition components and cost of goods and things like that so that we'll all be on the same page as far as -- just as far as it relates to our agreement. You know, like I say, I don't need to see anything else and all I'm interested in is that you and I have accurate numbers as far as our agreement. And unless she -- unless she's doing the books, I don't see how that's possible. You know, it's going to be a nightmare otherwise. I don't see it workable. But I can touch base with her and see where she is, but I think she pretty much is where I said she is so...

MR. TUBB: That's fine. I'll give her a call.

MR. STERLING: All right. Well, like I say, when I get that check, I'll start moving on getting the web site going and --

MR. TUBB: You know we've got whatever it was, the (inaudible), whatever else there is. I don't know what else there is for sure so...

MR. STERLING: All right. All right. Well, all right. I got an email from your attorney and I'll talk to my attorney today and see if we can move this thing further still.

MR. TUBB: Very good.

MR. STERLING: Okay. Bye.

(End of audio recording.)

8

THE STATE OF TEXAS

COUNTY OF DALLAS

    I, LEICA TURNER, Certified Shorthand Reporter for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription, to the best of my ability, from the audio recording as provided to me.

    I further certify that I am neither attorney for, related to, nor employed by any of the parties to the lawsuit in which this recording was taken.  Further, I am neither related to nor employed by any attorney of record in this cause; nor do I have a financial interest in the matter.

    Certified to on this the 8th day of April, 2014.



LEICA TURNER, CSR NO. 5622
Registration Expires: 12/31/15
Firm Registration No. 266
SUNBELT REPORTING & LITIGATION SRVCS
100 E. Ferguson Street
Suite 900
Tyler, Texas  75702
Phone:  903.593.3213



Recorded Phone Conversation

Between James Sterling and David Tubb

01/24/13

MR. TUBB: Hello.

MR. STERLING: David? James.

MR. TUBB: James? How are you doing?

MR. STERLING: All right. What's up?

MR. TUBB: Hang on. Hang on a second here. I've got the cord everywhere. Okay. Sorry about that. I saw we got our boxes in.

MR. STERLING: Yeah.

MR. TUBB: You said -- you said there was -- there was some issue with the color?

MR. STERLING: No, the color is fine. The boxes look great. Nicest boxes I've ever seen.

MR. TUBB: Okay.

MR. STERLING: There was a minor flaw on the printing process on the (inaudible) boxes.

MR. TUBB: Okay. So that means that there's -- the letters are messed up or the colors are messed up or --

MR. STERLING: There's -- in the circle on the (inaudible) it had stamped -- the circle is broken. It was some kind of a press alignment problem.

MR. TUBB: Okay.

MR. STERLING: They said that you could either accept them at a discount or have them reprinted at no cost and my suggestion would be to have them reprinted.

MR. TUBB: Right.

MR. STERLING: It would take about two weeks and they'd do it no charge of course.

MR. TUBB: Right. Right. We had a couple thousand of those or something, correct?

MR. STERLING: Yeah, there's four small boxes and they could probably be shipped out UPS.

MR. TUBB: Right. That's probably the easiest thing, yeah.

MR. STERLING: Okay. I'll let them know.

MR. TUBB: Yeah, that could be a plan, so, anyway, and, let's see, how are we doing on our stuff with Kerrigan?

MR. STERLING: Haven't moved anything on that.

MR. TUBB: Okay.

MR. STERLING: Been kind of tied up with other things.

MR. TUBB: Okay. Is that next on the plan then?

MR. STERLING: Yeah, as soon as I can kind of get some time free I can start spending some time on that.

MR. TUBB: Okay. I'd like to get that done so anyway...

MR. STERLING: Okay.

MR. TUBB: Has there -- has there been any movement with the attorneys?

MR. STERLING: Everybody has been traveling,

4

including myself, and we kind of lost a week. I kind of expect them to get together early next week.

MR. TUBB: Okay. Did you end up going to the shot show?

MR. STERLING: I did not. I had to go somewhere else.

MR. TUBB: Okay. All right. (Inaudible). (Inaudible) says we're going to have some bullets pretty soon so...

MR. STERLING: Yeah, okay. What's Art's situation?

MR. TUBB: Oh, you know, he asked me if I wanted any more .308 brass and I feigned off at this point because we've got .308 brass.

MR. STERLING: Uh-huh.

MR. TUBB: At this point anyway so...

MR. STERLING: Yeah, the hot ticket right now is .223. Federal ball ammo is going for $1.10 a round.

MR. TUBB: Understood.

MR. STERLING: So --

MR. TUBB: And, you know, I'm still waiting on Mr. (inaudible)'s stuff. I've pushed him -- you know.

MR. STERLING: Really?

MR. TUBB: Yeah, don't have any of that yet.

MR. STERLING: Well, that's interesting because I ordered one in .223 and one in .9 millimeter and had it

5

within three days.

MR. TUBB:  That's interesting.

MR. STERLING:  That was --

MR. TUBB:  I don't know what's going on then.

MR. STERLING:  That was within -- that was two weeks ago.

MR. TUBB:  Yeah, well, maybe I should re-rip my email to him then, you know, maybe it got -- fell off the wall in a crack or something.

MR. STERLING:  Because I know that, you know, the distributors, I got that through, what was it, CED on-line, and when I first placed the order, it was -- it matched up to what he said as far as they were expected after Christmas.

MR. TUBB:  Right.

MR. STERLING:  And within I think a week they showed up so...

MR. TUBB:  Okay.  Well, I'll go in there and resend my email to him and see if I -- I expected them a long time ago based on what he said, so, yeah.

MR. STERLING:  Yeah, okay.  All right.

MR. TUBB:  Anyway.

MR. STERLING:  Well, let me move forward with this because this week is pretty much shot.  I'll say next week I'll follow up with the attorneys and make sure

6

they make contact and see if anything can move on that.

MR. TUBB: Okay.

MR. STERLING: And I got Linda Pitts's copy of the email yesterday. She's still waiting on some stuff from me. So just everything has kind of been on hold since we kind hit our heads here so...

MR. TUBB: Uh-huh.

MR. STERLING: Let me think about this over the weekend and see if I can plan next week out.

MR. TUBB: Okay. Well, I'd like to get all that stuff, you know, we talked about finished.

MR. STERLING: All right.

MR. TUBB: And finalized. Okay?

MR. STERLING: Okay.

MR. TUBB: That would be great. Thanks, James.

MR. STERLING: All right.

(End of audio recording.)

THE STATE OF TEXAS

COUNTY OF DALLAS

I, LEICA TURNER, Certified Shorthand Reporter for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription, to the best of my ability, from the audio recording as provided to me.

I further certify that I am neither attorney for, related to, nor employed by any of the parties to the lawsuit in which this recording was taken. Further, I am neither related to nor employed by any attorney of record in this cause; nor do I have a financial interest in the matter.

Certified to on this the 8th day of April, 2014.



LEICA TURNER, CSR NO. 5622
Registration Expires: 12/31/15
Firm Registration No. 266
SUNBELT REPORTING & LITIGATION SRVCS
100 E. Ferguson Street
Suite 900
Tyler, Texas 75702
Phone: 903.593.3213



Recorded Voice Mail

From David Tubb to James Sterling

01-29-13

2

MR. TUBB:  James, it's David again.  Sue has been visiting with the accountant and we need your Social Security number for a 1099.  If you'd give her a call and let her have that, that would be great.  Thank you.

(End of audio recording.)

3

THE STATE OF TEXAS

COUNTY OF DALLAS

I, LEICA TURNER, Certified Shorthand Reporter for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription, to the best of my ability, from the audio recording as provided to me.

I further certify that I am neither attorney for, related to, nor employed by any of the parties to the lawsuit in which this recording was taken. Further, I am neither related to nor employed by any attorney of record in this cause; nor do I have a financial interest in the matter.

Certified to on this the 8th day of April, 2014.



LEICA TURNER, CSR NO. 5622
Registration Expires: 12/31/15
Firm Registration No. 266
SUNBELT REPORTING & LITIGATION SRVCS
100 E. Ferguson Street
Suite 900
Tyler, Texas 75702
Phone: 903.593.3213

# APPENDIX B

# DETAILED PHONE-CALL TRANSCRIPT EXCERPTS

## (PX55 & DX17, 18a, 19a, 20a & 21a)

# Phone-Call Transcript Summary
## PX55 & DX17, 18a, 19a, 20a, & 21a

**Monday, December 31 phone-call transcript:**

Tubb: Calls "meeting face-to-face … a great plan" and promptly suggests a mutually convenient place between Canadian and Tyler – in Dallas, where Tubb was scheduled to be at the Safari Club show. DX 17 at 2.

Sterling: Calls Tubb's suggestion "probably as good as any" for a meeting, then *apologizes* for having "butted heads" and gotten his "feelings hurt." *Id.* at 3.

Tubb: ".. [Y]ou and I decided we were going to do a deal and 50 percent is 50 percent. … [M]y big concern is … where is this most efficiently run from. … [A]nd obviously today I think it's most efficiently run from … where we have it. … There's no doubt. But … one of the things that hurt my feelings too was I made a big deal about how close I was to the proximity of the railroad tracks [in Canadian] . . . and you've got trains going by your house. …"

Sterling: "… I'm open to all considerations …" *Id.* at 3-4.

Sterling: "… I'm setting this thing up on a shoestring to keep the expenses down, otherwise, we're not going to have any profit to do anything with.

Tubb: "I'm 100 percent on that deal." *Id.* at 5.

Sterling: "And there's been some people interjecting into this that really hurt my feelings …."

Tubb: "[R]ight. I understand that." *Id.* at 6.

Tubb: [Returning to his prior hesitance to set up manufacturing so close to a railroad track:] "… I'm over it …" *Id.* at 7.

Tubb: [O]bviously I sent you an agreement, that was from my guy in Amarillo, you know, a rough draft …"

Sterling: "Well, the blank document, you know, whatever is appropriate as far as the legal entity that I described to you from the beginning ... that keeps the assets of the business ... separate from everything else ... [a]nd lays out a fair agreement ..."

Tubb: "... I'm all over fair ..." *Id.* at 7-8.

Sterling: "[W]e have to hammer out this agreement ... I think that probably you should have your attorney there too so we could."

Tubb: "Yeah, I know that won't work [presumably because his lawyer is in Amarillo, not Dallas]

Sterling: "Okay. Well, ... let me talk to my attorney and see, you know, what we can do here. ... [B]ut we really need to – to get that part of this arrangement behind us. ..."

Tubb: "Sure ...."

Sterling: "But anyway, I'm sticking to our agreement, I'm still working, and fully intend to do what I said I was going to do."

Tubb: "All right. Enough said."

Tubb: "... [W]e need to visit anyway ..."

Sterling: "[M]aybe I can get over there and meet you at the Safari Club."

Tubb: "... [W]e need to get an agreement if we're going to move forward on this, you know. ..."

Sterling: "I think that would be in both our best interests ...."

Tubb: "... [N]ot to poke, but we can't – you can't do it if you want a venture agreement in Texas according to everybody I talked to. Its got to be a different ... on a different animal."

Sterling: "...[L]ike your attorney said, as far as indebtedness [*i.e.,* personal liability of joint venturers for the venture's debts], they [sic] may apply. And I don't know if that's true but if it is and that's not the appropriate thing to do then I'm open to some other kind of agreement. ..."

Sterling: "... [T]hat's why I said we need to just get our attorneys involved and let them work it out between them ..."

Tubb: "Right. Well, maybe we'll sit down and visit and kind of put some outline to it. ..."

Sterling: "... I'll be in touch and we'll just keep moving forward, David."

Tubb: "Yeah, I think this thing [the Safari Club show] is Thursday, Friday, Saturday."

Sterling: "Yeah, let me look at my schedule and see what I can do."

Tubb: "All right. Very good." *Id* at 8-11.


**Friday, January 4, 2013 phone-call transcript:**

Tubb: "I didn't know if you ever come up with maybe a time or something. I'm down here for the Safari Club show."

Sterling: "No."

Tubb: "If you wanted to try to get together."

Sterling: "No. Yeah, yeah, the purpose of me trying to get together with you face-to-face is try to ... get my attorney over there and maybe draw up some kind of agreement. But if we can't do that, then there's no sense in me coming over."

Tubb: "... I would be happy to visit ...."

Sterling: "... [W]e talk all the time on the phone ...."

Tubb: "... [M]aybe we ought to just sit down and budget some time ... and we'll go back through and ... reiterate and cover our points and see if we can move forward here ...."

Sterling: "Well, I think that's probably what we ought to do. ..."

Sterling: "So whatever we got to do here, we got to do."

Tubb:      "... [Y]ou want to try to visit Monday or something like that?

Sterling:  "Yeah, Monday is fine."


**Monday, January 7, 2013 phone-call transcript:**

Tubb:      "... I may be unclear on some things. I truly have not deviated ever from half the net profits .... I'm still holding on that. ... any comment about that?"

Sterling:  "No, that was our understanding."

Tubb:      "... [E]very joint venture that I've done ... typically nobody got paid until we had a sale. ... Do you concur with that?"

Sterling:  "My agreement was that I deferred all my time and expenses as equity in the joint venture and so I was expecting to manufacture the ammunition per agreed for 50 percent of the net profit."

Tubb: "Absolutely, that's, yeah, understood and I see nothing wrong with that."

Tubb:      [Obviously referring to the 12/29 email that Sterling had intended for his lawyer:] "You made the comment ... in one of your e-mails or something you were ... really interested in attaching a lien on those machines."

Sterling:  "No, I don't think so." PX55 at _____ DX _____ at 2-4.

Sterling:  "... Its been over a year now and there's been no income."

Tubb: "I understand."

Sterling:  "And my time keeps adding up, so, yeah, I would need to start having some income to justify my time ...."

Tubb:      "So what is your time at this point?"

Sterling:  "... [I]t's a high number."

Tubb:      "... What's your hourly rate, James?" *Id.* at 4-5.

...

Sterling: "...And the San Diego Media project [*i.e.*, the invoices Sterling agreed to commit as equity in the deal] I think that needs to go ahead and get paid one way or the other. ... [L]et me know whether you're going to pay it or not." *Id.* at 15.


**Tuesday, January 8 phone-call transcript (PX 55; DX 19A):**

Tubb: "I got your bill that you sent [regarding the San Diego Media Website project]. PX 55 at ___; DX 19a at 2.

...

Tubb: "... [H]oly smokes ...." *Id.* at 7 (expressing amazement at Sterling's "bill" for his services on the ammunition deal).

Sterling: "[T]he only way we can move forward and you not pay me for my time this year is with a signed contract in which we go into the ammunition business ...."

Tubb: "... I want to do the ammo thing. ... I just think that what you did is not what I would have done. Okay? I would have been up front and say I'm going to bill you for this whole thing, this is my rate and this is how much (inaudible) on this.... [Y]ou're worth your 140 bucks an hour, 120 bucks an hour working on these QuickBooks and working on San Diego media and all that stuff, but [on] this joint venture thing, ... I don't think ...that's a prudent figure."

Sterling: "...[I]f you want to have a parting of the ways, then you can get your equipment out of here and we can–we can move on. ..."

Tubb: "What would you prefer?"

Sterling: "... I'm willing to move forward but I'm not going to do it without some kind of written contract ... we should have done that from the beginning."

Tubb: "Yeah, we really should have."

Sterling: "I've said that over and over ..."

Tubb:       "Well, James, you wanted to do the joint venture [form of relationship] ... and everybody I've talked to on my–said that's–the way you had your joint venture constructed (inaudible) and/or the fact that you can't use a joint venture very well in Texas."

Sterling:   "That's fine. ... I'm more than willing to do whatever is appropriate. ..."

Tubb:       "... [D]id you read that LLC, the one I sent you that came from Ruben?"

Sterling:   "Yeah, it was blank so none of our agreement was in there. So, yeah, an LLC would be fine but our agreement as we have documented it over the period of this last year would have to be put in there and agreed to by both sides."

Tubb:       "That's right. And that may be very hard for us to do. I don't know."

Sterling:   "But that's where we are."

Tubb:       "Right. Well, what is the status on these boxes [*i.e.*, boxes for retail ammunition sales]?"
...

Tubb:       ".... You're bringing in ... your big bill [on the ammunition project]. ... [I]t doesn't quite sit with me. The rest of your billing, ... I have zero issues with that."

Sterling:   "... [D]oes that mean you're going to write me a check for the San Diego Media project bill I sent you yesterday?"

Tubb:       "I will."

Sterling:   "... Obviously my time is worth something. All right?"

Tubb:       "I agree. ..."

Sterling:   "... As to what that value is, we'd have to put it in a contract and see what sticks in your craw."

Sterling:   "... But who's going to be your attorney that's handling it? Is it going to be the guy in Amarillo?

Tubb:      "Yeah, … He's a very good business attorney."

Sterling:  "… I imagine he's probably seen that sample joint venture agreement that I had sent to you previously. …"

Tubb:      "… [H]e was just like Andy. He said it's not a good one."
…

Sterling:  "But that's simply a boilerplate joint venture agreement. … [I]f there's a better agreement out there, … then we can get our attorneys on it …."

Tubb:      "Well, I think that's (inadudible). … [O]bviously next week I'm going to visit with several people. Obviously … we can't make any money if we don't have product so … "
…

Sterling:  "… So I'm willing to move forward with you."

Tubb:      "Okay. Well, I'll ring you tomorrow. …"

## Wednesday, January 9 phone-call transcript (DX 20a):

Tubb:      "(inaudible) let you know we're going to (inaudible)."

Sterling:  "We're going to what?"

Tubb:      "Get you a check."
…

Sterling:  "… [W]hen I get that check, I'll start the process [referencing Superior's web-site and inventory-control projects].
…

Sterling:  "… [W]e're still not quite out of that San Diego Media mess and they've actually got … control of that web site. …"
…

Sterling:  "… She's waiting on a SKU number scheme-up from me as to tracking the ammunition components and cost of goods and things like that so that we'll all be on the same page … [A]s far as it relates to our agreement. … I don't need to see anything else [respecting access to Superior's

financial data] and all I'm interested in is that you and I have accurate numbers as far as our agreement. ..."

Tubb:      "That's fine."
...

Sterling:  "... I got an email from your attorney and I'll talk to my attorney today and see if we can move this thing further still."

Tubb:      "Very good."

**Thursday, January 24 phone-call transcript (DX 21a):**

Tubb:      "I saw we got our boxes in. ..."

Tubb:      "You said ... there was some issue with the color?

Sterling:  "No, the color is fine. ...

Sterling:  "There was a minor flaw on the printing process ..."

Sterling:  "[M]y suggestion would be to have them [the ammo boxes] reprinted."

Tubb:      "That's probably the easiest thing, yeah."
...

Tubb:      "... [H]as there been any movement with the attorneys?"

Sterling:  "Everybody has been traveling, including myself, and we kind of lost a week. I kind of expect them to get together early next week."
...

Tubb:      "... (inaudible) says we're going to have some bullets pretty soon so ..."

Sterling:  "Yeah, okay. What's Art's situation?"

Tubb:      "... [H]e asked me if I wanted any more .308 brass and I feigned off at this point because we've got .308 brass."

Sterling:  "Uh-huh."

Tubb:      "At this point anyway so ..."

Sterling:  "Yeah, the hot ticket right now is .223."

Tubb:      "... I'm still waiting on Mr. (Inaudible)'s stuff. I've pushed him–you know."

Sterling:  "Really?"

Tubb:      "Yeah, don't have any of that yet."

Sterling:  "... [T]hat's interesting because I ordered one in .223 and one in .9 millimeter and had it within three days."

Tubb:      "That's interesting. ... I don't know what's going on then."
...

Tubb:      "... I expected them a long time ago based on what he said ..."

Sterling:  "... All right."
...
Sterling:  "... [L]et me move forward with this because this week is pretty much shot. I'll say next week I'll follow up with the attorneys and make sure they make contact and see if anything can move on that."

Tubb:      "Okay."